In the
United States Court of Appeals
For the Seventh Circuit

No. 00-1672

ROBERT ZIVITZ and NANCY ZIVITZ,

Plaintiffs-Appellees,

v.

JOEL GREENBERG,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 5350--Suzanne B. Conlon, Judge.

Argued December 7, 2000--Decided February 4, 2002

Before BAUER, MANION, and ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  Robert and Nancy Zivitz brought this action alleging that several defendants cost them millions of dollars in investments by participating in an insider trading scheme involving Incomnet, a telephone service reseller. The plaintiffs eventually settled with all of the defendants except one-- Incomnet board member Joel Greenberg. A jury later found Greenberg liable for fraud and awarded the plaintiffs $1 million in damages. After the jury returned its verdict, Greenberg moved to reduce the damages award by the amount previously paid to the plaintiffs by the settling defendants; the district court, however, denied his request. On appeal Greenberg challenges the court's refusal to reduce the jury's damage award. We affirm.

We construe the facts in the light most favorable to the jury's verdict. The plaintiffs first purchased Incomnet stock in 1991; as of July 1995, they owned 750,000 shares. Incomnet's board included Sam Schwartz, the company's president and CEO; Rita Schwartz (Sam's wife); and Greenberg, a family friend and investment adviser of the plaintiffs. Sam and Rita Schwartz owned the largest percentage of Incomnet stock; Greenberg was the next

largest shareholder.

Incomnet's revenue and stock price grew over time, helped in part by a series of insider trades. In January 1994 Incomnet (through Sam Schwartz) entered into a consulting agreement with an investment firm, Broad Capital Associates, Inc. ("Broad Capital"). Under this agreement, Broad Capital agreed to serve as Incomnet's financial adviser in exchange for warrants to purchase 500,000 shares of Incomnet stock. Broad Capital also agreed not to resell Incomnet stock. In addition to the consulting arrangement, that same year Sam Schwartz sold 500,000 shares of Incomnet stock to Broad Capital through a brokerage account. Schwartz did not disclose this transaction to the Securities and Exchange Commission ("SEC") even though he was required by law to do so. In May 1994 Incomnet (again, through Schwartz) issued additional warrants to Broad Capital for another 500,000 shares in exchange for Broad Capital's early exercise of the warrants conveyed pursuant to the consulting agreement. In December 1994 Broad Capital exercised these warrants and, contrary to the consulting agreement, sold 501,000 shares of Incomnet stock.

In January 1995 Broad Capital loaned Greenberg $1.8 million, securing the loan with 513,000 shares of Incomnet stock. Broad Capital made no public filing of the loan and immediately sold the stock at a substantial profit.

In February 1995 Incomnet acquired a majority interest in Rapid Cast, Inc. ("RCI"), a privately held company whose founding shareholders were also the sole shareholders of Broad Capital. Incomnet paid for its majority interest in RCI with cash and Incomnet stock. As part of this acquisition, RCI shareholders were to receive up to 750,000 shares of Incomnet stock if RCI met specified earnings targets. In June 1995, however, Incomnet issued 600,00 shares to RCI in exchange for RCI shareholders' waiver of their conditional right to receive the 750,000 shares. Ultimately RCI did not meet the specified earning targets.

After Incomnet's stock price began to fall, the plaintiffs, relying on a computerized trading model, decided to

sell their stock. Before doing so, however, they spoke with Greenberg, who convinced them not to sell. Greenberg assured the plaintiffs that Incomnet was stable and that its stock had good value. Soon thereafter Incomnet disclosed to the SEC that Sam Schwartz had traded Incomnet stock to defend against short-sellers. A subsequent Incomnet SEC filing represented that these trades had been unanimously approved by the board and that Schwartz had tendered to Incomnet all of the short-swing profits generated by the trades. Greenberg and Schwartz later admitted that these statements were false.

Incomnet's stock price plummeted after it publicly disclosed Schwartz's trades; Schwartz and Greenberg eventually resigned under pressure. Incomnet's stock never recovered and the company eventually filed for bankruptcy protection.

In August 1998 the plaintiffs brought this diversity action against Broad Capital (and its two principals), Sam Schwartz, Rita Schwartz, and Greenberg. The complaint alleged civil conspiracy and common-law fraud. The district court dismissed the plaintiffs' fraud claims for lack of personal jurisdiction against all of the defendants except Greenberg. After the court denied the defendants' motions for summary judgment, the plaintiffs reached a settlement with Sam and Rita Schwartz for $250,000.

On the morning of trial, the plaintiffs informed the district court that they had reached a settlement with the Broad Capital defendants. The court then dismissed the conspiracy claims against the Broad Capital defendants and the case proceeded against Greenberg. At the close of evidence, the plaintiffs moved to dismiss the conspiracy count and the court granted their request--all that remained was the plaintiffs' fraud claim.

After closing argument, the court instructed the jury to assess damages in an amount "that will reasonably and fairly compensate [the plaintiffs] for any actual damages proven by the evidence to have resulted from the conduct of the defendant, Joel Greenberg." Greenberg had proposed this instruction in the pretrial order. The jury's $1 million verdict was

far less than the amount requested by the plaintiffs.

Greenberg filed a timely motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e), arguing that the settlement amounts paid to the plaintiffs should be offset against the jury award to prevent a double recovery. Because the amount recovered by the plaintiffs exceeded the verdict, Greenberg asked the court to reduce the damage award to zero. The district court denied his motion,concluding that Greenberg could not demonstrate that the jury assessed damages for a single injury caused by all of the defendants, particularly since the court had instructed the jury to award damages only for Greenberg's own conduct.

On appeal Greenberg argues that the district court erred by refusing to offset the damages award by the amount paid by the settling defendants. We review the court's denial of Greenberg's Rule 59(e) motion for abuse of discretion. See Bordelon v. Chi. Sch. Reform Bd. of Trs., 233 F.3d 524, 529 (7th Cir. 2000). Under Illinois law, which the parties agree applies to this dispute, see Grundstad v. Ritt, 166 F.3d 867, 870 (7th Cir. 1999), "[w]hen a settlement is reached in good faith, the amount a plaintiff receives on any claim against any other nonsettling tortfeasors is to be reduced by the amount stated in the settlement agreement, or the amount actually paid by the settling tortfeasor, whichever is greater." Dubina v. Mesirow Realty Dev., Inc., 756 N.E.2d 836, 842 (Ill. 2001); 740 ILCS 100/2(c). Illinois law therefore "protects nonsettling defendants from paying more than their pro rata share of the final damage judgment and reflects a public policy protecting the financial interests of nonsettling tortfeasors." Dubina, 756 N.E.2d at 842. Nonsettling tortfeasors, however, are entitled to a setoff only for damages that are awarded for the same injury for which the settling defendants compensated the plaintiff. Pasquale v. Speed Prods. Engineering, 654 N.E.2d 1365, 1382 (Ill. 1995); Berard v. Eagle Air Helicopter, Inc., 629 N.E.2d 221, 223 (Ill. App. 1994).

Greenberg bears the burden of demonstrating that he is entitled to a setoff. Pasquale, 654 N.E.2d at 1382;

Kravcik v. Golub & Co., 676 N.E.2d 668, 674-75 (Ill. App. 1997); Muro v. Abel Freight Lines, Inc., 669 N.E.2d 1217, 1218 (Ill. App. 1996). Greenberg argues that the jury's verdict resulted in a windfall for the plaintiffs because they had already been compensated (through settlements) in excess of $1 million, the dollar value of their injury as calculated by the jury. He asserts that the jury compensated the plaintiffs for the same injury covered by the settlements because the fraudulent acts committed by Greenberg also furthered the conspiracy.

We conclude that the court did not abuse its discretion by denying a setoff. The jury in this case could have easily inferred Greenberg's individual liability arising from his own actions, separate and apart from the conspiracy. At trial the plaintiffs presented evidence that Greenberg lied to them regarding Incomnet's financial condition in thesummer of 1995--misrepresentations that led them to hold onto the stock longer than they should have. Greenberg's communication with the plaintiffs led to a distinct harm-- the jury could have punished him solely for his own conduct and not for the acts of his alleged co-conspirators. See Pasquale, 654 N.E.2d at 1382 (recognizing that courts should not impose a setoff against a recovery from injuries separate and distinct from those for which the plaintiff was already compensated through settlement). Consequently, despite Greenberg's urging, we cannot hold as a matter of law that the jury awarded damages for the identical injury that formed the basis of the conspiracy claim. The jury could have reasonably found that Greenberg's fraud injured the plaintiffs by making them hold onto the stock, and that their financial loss was exacerbated by the conspiracy. In other words, the jury could have concluded that the plaintiffs suffered two injuries that are related but not identical. See id.

Moreover, the district court, employing a damages instruction selected by the parties, instructed the jury to compensate the plaintiffs for those injuries that resulted only from Greenberg's conduct. This instruction was consistent with Greenberg's trial strategy, which was to separate himself

from the actions of the other defendants. Greenberg testified at trial that he had no knowledge of the insider trading or of Broad Capital's involvement in buying and selling Incomnet stock. This account of the facts was corroborated by Sam Schwartz. Indeed, this strategy may have paid off--the jury awarded the plaintiffs only $1 million, far less than the $10 million they sought. The amount awarded by the jury may reflect its best effort to hold Greenberg accountable only for his own actions and not for the acts of the conspirators.

In any event because Greenberg agreed to the general damages instruction, he may not challenge a jury award that reflected a proper application of that instruction to the facts. See Jabat, Inc. v. Smith, 201 F.3d 852, 857 (7th Cir. 2000). Greenberg could have proposed a more detailed instruction; for instance, he could have asked the jury to determine the dollar loss attributable to both the conspiracy and to Greenberg's fraud. Had the jury been so instructed and awarded damages in an amount that exceeded the calculated amount attributable to the fraud, then the court may have had a basis to reduce the damages award; we would not need to speculate whether the jury was compensating the plaintiffs for the same injury covered by the settlements. But the parties agreed to instruct the jury to compensate the plaintiffs for the injury caused byGreenberg, and there is no indication that the jury did not follow that instruction. Therefore, Greenberg must abide by the jury's damage award, and the court did not abuse its discretion by denying his request for a setoff.

The judgment of the district court is AFFIRMED.