In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-1709

HYATT INTERNATIONAL CORP., et al.,

*Plaintiffs-Appellants,*

*v.*

GERARDO COCO, et al.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CV 1704—**Paul E. Plunkett**, *Judge.*

ARGUED NOVEMBER 26, 2001—DECIDED SEPTEMBER 3, 2002

Before ROVNER, DIANE P. WOOD, and WILLIAMS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* It has become commonplace to observe that the world is getting smaller and that boundary lines between one country and the next have become blurred, if not nonexistent. Yet those boundary lines still exist, and one of their more important functions is to allocate litigation among the several national court systems. This can be tricky, if a business relationship that has flowed seamlessly from one country to another goes sour. We have just such a case. Gerardo Coco, an Italian businessman who had dealings with Hyatt International Corporation. (Hyatt) in Chicago concerning a

property in Italy, is fighting Hyatt's effort now to hale him into the U.S. courts to resolve some disputes that have arisen. His challenge to that attempt prevailed in the district court, but we conclude that the case should not have been dismissed for lack of personal jurisdiction, and we therefore remand for further proceedings.

**I**

Coco is a director and employee of A.T.E. Holdings, Limited, and of A.T.E. Italia, S.r.l. (collectively A.T.E.). A.T.E. Holdings, Limited, is a business organized under the laws of England with its principal place of business in London; A.T.E. Italia, S.r.l., is a business organized under the laws of Italy, with its principal place of business in Milan.

Through the A.T.E. entities, Coco enters into ventures for the development of real estate in the hospitality industry. He provides a full range of services as a developer, investor, broker, or even contractor for hotel properties. It was in these capacities that he was approached in 1999 by the English entity Newpenny, Limited (Newpenny), which had an option to purchase a real estate parcel suitable for a hotel in downtown Milan. Newpenny asked Coco to facilitate its development of the parcel by finding investors willing to commit resources to the project. Thinking he might find an interested party in Hyatt, Coco sent a fax to Michael Evanoff, Hyatt's Vice President of Development, at Hyatt's Chicago headquarters. Evanoff, apparently intrigued by the opportunity, responded positively, and later he met with Coco to discuss the incipient project over dinner in London. At that time, Coco unequivocally stated that he was acting merely as an agent of Newpenny, and accordingly was not seeking a commission or broker's fee from Hyatt. Evanoff confirmed Hyatt's interest in a possible deal.

Flurries of faxes and phone calls between Milan and Chicago followed, and Coco even visited Evanoff at Hyatt's

Chicago headquarters on one occasion in connection with the proposed deal. The parties' initial discussions contemplated an agreement whereby Hyatt would own 50% of the equity in the project, and Coco and Newpenny would own 20%. But despite these promising efforts, that agreement fell apart, and on July 7, 1999, Hyatt went ahead solo in the development of what will soon open as the Park Hyatt Milan. At that point, Coco re-entered the picture and claimed that Hyatt owed him a broker's fee for the work that he performed that ultimately led to Hyatt's project. Hyatt took the opposite position, claiming that Coco had expressly disclaimed any right to such a fee.

Coco responded with two arguments. First, he referred to a supposed promise that Hyatt made to him during one of the final meetings in Milan, when Hyatt expressed its desire to undertake the development without any assistance. This promise, he claimed, was backed by a later recommendation that he be provided a "$1,000 per key finders' fee," as is supposedly customary, at least overseas. He further argued that Hyatt could not have finalized this deal but for Coco's involvement, and he was accordingly entitled to some remuneration for his efforts. He attempted to reconcile this position with his earlier disclaimer of any right to a fee by asserting that the no-fee arrangement was effective only so long as there was some understanding between the parties that a partnership would ultimately be formed; once Hyatt took off on its own, he said, his status was transformed into that of a *de facto* broker.

More correspondence flowed between Chicago and Milan, and Coco threatened to sue Hyatt in Milan for the fee he was owed. After a few such threats, Hyatt filed an action under 28 U.S.C. § 2201 in the Northern District of Illinois seeking a declaratory judgment that it had no obligation to pay Coco and his entities any fee or commission in connection with the hotel development. Shortly

thereafter, Coco filed the threatened suit in the Civil Court of Milan seeking payment for his services.

While pursuing the currently pending Italian litigation, Coco and A.T.E. moved to dismiss the Illinois litigation on three grounds: lack of personal jurisdiction, *forum non conveniens*, and the impropriety of a declaratory judgment in this matter. The district court agreed with the defendants on the first point, finding that even though Coco had sufficient contacts with Illinois throughout the "partnership" part of the deal, the transaction out of which he was asking for the fee was a separate event that took place entirely outside of Illinois. Pursuant to the "transaction of business" provision of the Illinois long-arm statute, the district court dismissed the action for lack of personal jurisdiction.

## II

### A. Impropriety of Declaratory Judgment

Because Coco's argument concerning the propriety of Hyatt's effort to obtain a declaratory judgment potentially implicates the district court's jurisdiction, we choose to address it first (recognizing that the option is ours, under *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 578 (1999)). The question, in short, is whether Hyatt is impermissibly seeking an advisory opinion about its obligation to pay fees to Coco. If it is, then we would have to dismiss the suit for lack of a proper Article III case or controversy. If not, or at a minimum if the record requires further development on this point, dismissal on that ground would be premature.

Declaratory judgment actions serve an important role in our legal system insofar as they permit prompt settlement of actual controversies and establish the legal rights and obligations that will govern the parties' relationship

in the future. See Edwin Borchard, *Declaratory Judgments* 107 (1934). On the other hand, there is no doubt that the declaratory judgment mechanism can be abused. As we commented in *Hoover v. Wagner*, 47 F.3d 845 (7th Cir. 1995), "[d]eclaratory relief is discretionary in a strong sense, but that is probably because it is often used to seize the forum from the natural plaintiff." *Id.* at 850 (citations and emphasis omitted). In this case, the natural plaintiff is Coco: it is he who claims a right to a fee from Hyatt, and Hyatt that claims it has no such obligation. Furthermore, Hyatt's action does not fit particularly well within the usual declaratory judgment pattern, under which the "natural" defendant wants to proceed with a business opportunity—*e.g.*, the production of widgets—but it is impeded because of a lack of clarity as to its legal rights, fearing something like a possible patent infringement suit. See 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2751, pp. 455-56 (3d ed. 1998). It is hard to see what harm Hyatt would have suffered by waiting for Coco to sue, other than the normal uncertainty a defendant experiences while the statute of limitations is running and there is a possibility of a later obligation to pay money damages. Early resolution of a threat of litigation, in a friendly forum, is no doubt of value to a potential defendant, but the statute requires an "actual" controversy. That is easily seen in the patent example cited above, because the natural defendant is prevented from engaging in some extra-judicial conduct (that the law does not aim to discourage) as long as its patent rights are unclear.

Indeed, it is not just § 2201 that requires an "actual" controversy. As we have already noted, a declaratory action, like any other action, must satisfy Article III, which allows federal courts to act only in the event of actual "cases and controversies." See *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). The declaratory judgment plaintiff must be able to show that the feared

lawsuit from the other party is immediate and real, rather than merely speculative. *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506-07 (1972); *Norfolk Southern Ry. Co. v. Guthrie*, 233 F.3d 532, 534-35 (7th Cir. 2000). Hyatt's evidence on these points was thin, at least until Coco proved its prediction right by filing his Italian action. Until it sued Coco in the Northern District of Illinois, it was possible that Coco's repeated threats to sue Hyatt in Italy were no different from those of many other disgruntled co-venturers. If anything, Coco's delay in instituting his threatened suit suggests that the prospect of litigation was unclear. On the other hand, because the district court did not reach this question, we may not have all the relevant facts. We do not know, for example, whether under Italian law a broker has any kind of lien on the property or other powers to disrupt the business of Hyatt's new hotel in Milan. If that were the case, then Hyatt's action bears a closer resemblance to other declaratory judgment suits in which the declaration of rights is a *bona fide* necessity for the natural defendant/declaratory judgment plaintiff to carry on with its business.

Furthermore, the record may show that Coco's threats to sue had reached such a concrete point that Hyatt legitimately needed a declaration of its "rights and other legal relations" in order to go forward with the project in question. If there was a potential oral agreement between itself and Coco, the scope and terms of any such agreement could have an immediate effect on Hyatt. Of course the threat of suit, however immediate, is not by itself sufficient for the invocation of the federal power to issue a declaratory judgment: as other courts have noted, the Declaratory Judgment Act "is not a tactical device whereby a party who would be a defendant in a coercive action may choose to be a plaintiff by winning the proverbial race to the courthouse." *Terra Nova Ins., Co., Ltd. v. Acer Latin Am., Inc.*, 931 F. Supp. 852, 854-55 (S.D. Fla. 1996).

The existence of these questions is enough for present purposes to allow us to conclude that dismissal at this time for lack of an Article III controversy would be premature. If Coco had not sued, it would have been appropriate on remand to look into this question further. At this point, however, the matter has become somewhat academic, even though it remains true that later events cannot control the propriety of the district court's jurisdiction: "[o]nly the actions of the declaratory defendant known to the declaratory plaintiff at the time the action is commenced can be considered in determining whether such a threat exists." *Norfolk Southern Ry. Co.*, 233 F.3d at 534-35. See also *Trippe Mfg. Co. v. American Power Conversion Corp.*, 46 F.3d 624, 627 (7th Cir. 1995). We leave the question of any further exploration of this subject to the discretion of the district court.

### B. Personal Jurisdiction

We review a dismissal for lack of personal jurisdiction *de novo*. *Logan Prods., Inc. v. Optibase, Inc.*, 103 F.3d 49, 52 (7th Cir. 1996). Normally, on review of a motion to dismiss, this court accepts all well-pleaded allegations in the complaint as true. *Tobin for Governor v. Illinois State Bd. of Elections*, 268 F.3d 517, 521 (7th Cir. 2001). If personal jurisdiction is challenged under Rule 12(b)(2), the court must decide whether any material facts are in dispute. If so, it must hold an evidentiary hearing to resolve them, at which point the party asserting personal jurisdiction must prove what it alleged. Until such a hearing takes place, the party asserting personal jurisdiction need only make out a *prima facie* case of personal jurisdiction. *Id.* See also 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure*, § 1351, pp. 226-27 (2d ed. Supp. 2001).

A federal court sitting in diversity must rely on the law of personal jurisdiction that governs the courts of gen-

eral jurisdiction in the state where the court is sitting. *Dehmlow v. Austin Fireworks*, 963 F.2d 941, 945 (7th Cir. 1992). In this case, the law to which the district court correctly turned was that of Illinois. (Even though the case is governed by state law, the method of service, in contrast, will be governed by FED. R. CIV. P. 4; Rule 4(e)(1) in turn allows use of the methods authorized by the law of the state in which the district court is located, while other parts of Rule 4 provide federally sanctioned alternatives.). As we had occasion to observe in *United Rope Distribs., Inc. v. Seatriumph Marine Corp.*, 930 F.2d 532, 534-35 (7th Cir. 1991), a federal court borrowing a state jurisdictional statute may acquire personal jurisdiction only to the extent that the state law authorizes service of process.

Illinois, like virtually every other state, authorizes service of process both on in-state defendants and—pertinent to our case—out-of-state or "foreign" defendants (meaning both those from other U.S. states and those like Coco from foreign countries). See 735 ILCS 5/2-209. The question is whether any applicable limitations exist to make service on Coco and his two companies improper. Those limits might be found within the Illinois statute itself, or, if the Illinois statute goes beyond the scope authorized by the due process clause of the Fourteenth Amendment to the U.S. Constitution, those limits might be constitutional in nature. We look first to the state statute, and then to the Constitution.

The Supreme Court has adopted the labels first proposed in the academic literature that distinguish between "general" jurisdiction and "specific" jurisdiction. See *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414 nn.8, 9 (1984) (citing Arthur T. von Mehren and Donald T. Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis*, 79 HARV. L. REV. 1121 (1966)); see also *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952).

So-called general jurisdiction is proper only when the defendant has "continuous and systematic" contacts with the state in question; if such contacts exist, the court may exercise personal jurisdiction over the defendant even in cases that do not arise out of and are not related to the defendant's forum contacts. But as Hyatt has not asserted that Illinois can exercise general jurisdiction over the defendants, we consider only the propriety of specific jurisdiction, a more limited assertion of state power, in which personal jurisdiction exists for controversies that arise out of or are related to the defendant's forum contacts. See *Steel Warehouse of Wisconsin, Inc. v. Leach*, 154 F.3d 712, 714 (7th Cir. 1998).

### 1. Illinois's Long-Arm Statute

Some long-arm statutes contain a list of permitted grounds of jurisdiction, into which a particular case must fit, while other long-arm statutes simply authorize the state courts to assert personal jurisdiction on any basis not forbidden by the due process clause of the Fourteenth Amendment. Until 1988, Illinois's statute was of the former type. In 1988, however, the law was amended to add a new subsection (c) which reads as follows: "A court may also exercise jurisdiction on any other basis [apart from those enumerated in subsections (a) and (b)] now or hereafter permitted by the Illinois Constitution and the Constitution of the United States." 735 ILCS 5/2-209(c); see *Central States, Southeast and Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 940 (7th Cir. 2000). Hyatt argues that this addition in effect makes the enumerated grounds of jurisdiction superfluous, and leaves for us only the question whether the proposed assertion of jurisdiction would violate either the Illinois Constitution or the U.S. Constitution. Coco disagrees, claiming that the catch-all provision does not apply.

The district court agreed with Coco and eschewed reliance on the catch-all; instead, the court looked to § 2-209(a)(1), which authorizes jurisdiction based upon "[t]he transaction of any business within this State" to see if Coco could be reached that way. (Insofar as the enumerated sections are concerned, Hyatt does not claim that the court should have consulted a different part of the law.) Under this provision, the district court found that Coco's acts in Illinois were not sufficient to warrant the exercise of jurisdiction. It reached this conclusion by limiting its consideration of in-state contacts to those related to Coco's actions after the partnership deal fell apart. Only then, the court reasoned, did Coco's alleged brokerage arise. As Coco had no contacts with Illinois during that phase of his dealings with Hyatt, specific jurisdiction could not be established.

The question before us is whether the district court properly interpreted § 2-209. If, as Coco and the district court thought, the catch-all provision of the statute covers only situations not already addressed in the enumerated sections, or if the catch-all is not available when a more specific section appears to cover the conduct at issue, then we would need to consider whether the court correctly evaluated the "transaction of business" that occurred here. If, on the other hand, the catch-all applies whether or not an enumerated section also seems pertinent, we can move directly to the Illinois and federal constitutional analysis.

While we appreciate the logic of the district court's conclusion, this court has already concluded that the Illinois long-arm statute now "permits its courts to exercise jurisdiction on any basis permitted by the Illinois and United States Constitutions." *Central States,* 230 F.3d at 940. The language of § 2-209(c) precludes the narrower approach: it would make no sense to refer to exercising

jurisdiction "also" on any "other" basis, if subsection (c) had no application when another section of the statute applied. Moreover, we have found no Illinois case interpreting § 2-209(c) to apply only to cases where none of the enumerated possibilities is met. (We recognize that this court in one instance reviewed an assertion of jurisdiction only under the enumerated clauses, and not under the catch-all, and concluded that jurisdiction was lacking. See *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537 (7th Cir. 1998). But there is no hint in the opinion in *IDS Life* that anyone argued for jurisdiction based on § 2-209(c); furthermore, it seems quite unlikely that the court would have reached a different result even if someone had. In other cases that looked more specifically at the question, we have turned directly to the constitutional inquiries. See *Central States*, 230 F.3d at 940; *Janmark, Inc. v. Reidy*, 132 F.3d 1200, 1203 (7th Cir. 1997).)

Our interpretation of Illinois law finds ample support in the decisions of the Illinois courts, which now apply the catch-all provision to establish jurisdiction even where jurisdiction could not be established through one of the enumerated clauses. See, *e.g.*, *Zazove v. Pelikan, Inc.*, 761 N.E.2d 256, 261 n.2 (Ill. App. Ct. 2001) (rejecting contention that the specific provision must be met if applicable even where the catch-all establishes jurisdiction). In fact, the catch-all may not make any difference on the present facts. This case is remarkably similar to *Deluxe Ice Cream Co. v. R.C.H. Tool Corp.*, 726 F.2d 1209, 1215-16 (7th Cir. 1984), in which we concluded that original discussions supported a finding of jurisdiction. We found unconvincing the separation of the transactions into two insulated jurisdictional entities, holding that "the contract under which the plaintiff is suing . . . lies in the wake of Bates' commercial activities in Illinois." *Id.* at 1216.

2. Illinois Constitutional Limits

Turning now to the constitutional aspects of the inquiry, an important, initial qualification appears in *Rollins v. Ellwood*, 565 N.E.2d 1302 (Ill. 1990). In *Rollins*, the Illinois Supreme Court drew a distinction between the due process rulings of the United States Supreme Court, which it recognized placed an outer limit on the state's ability to assert jurisdiction, and due process rulings under the Illinois Constitution. *Id.* at 1314. In order to give Illinois's long-arm statute "a definite meaning and scope that does not fluctuate with every new pronouncement on the limits of Federal due process," *id.,* the Illinois Supreme Court held that it would separately consider limitations that might exist under the due process clause of the Illinois Constitution. *Id.* at 1316. With that in mind, we proceed first to an evaluation of Illinois constitutional limits, and then to the federal due process clause.

Article 1, section 2 of the Illinois Constitution provides that "[n]o person shall be deprived of life, liberty or property without due process of law nor be denied the equal protection of the laws." The Illinois Supreme Court has construed this to require that jurisdiction may be "asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins*, 565 N.E.2d at 1316.

This court has previously suggested, however, that there is no operative difference between the limits imposed by the Illinois Constitution and the federal limitations on personal jurisdiction. *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1276 (7th Cir. 1997); *Klump v. Duffus*, 71 F.3d 1368, 1371 n.4 (7th Cir. 1995). While we acknowledge the concern of the Illinois Supreme Court expressed in *Rollins* that these two standards hypothetically might

diverge in some cases, we can find nothing in Illinois law that suggests that the due process limits in the kind of case now before us would be different at the state level and the federal level. Rather than repeat ourselves, therefore, we note that in no case post-*Rollins* has an Illinois court found federal due process to allow the exercise of jurisdiction in a case where Illinois limits prohibited it, and conclude that in this particular instance it is enough to evaluate the limits that the Fourteenth Amendment due process places on state exercises of personal jurisdiction.

### 3. Federal Constitutional Limits

The federal test for assertions of personal jurisdiction has been settled for more than fifty years: it is the familiar one found in *International Shoe Co. v. Washington*, 326 U.S. 310 (1946), which requires that the defendant must have minimum contacts with the forum state "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Id.* at 316 (citation omitted). Those contacts may not be fortuitous. Instead, the defendant must have "purposefully established minimum contacts within the forum State" before personal jurisdiction will be found to be reasonable and fair. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). Crucial to the minimum contacts analysis is a showing that the defendant "should reasonably anticipate being haled into court [in the forum State]," *id.* at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)), because the defendant has "purposefully avail[ed] itself of the privilege of conducting activities" there. *Burger King*, 471 U.S. at 475 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). While an out-of-state party's contract with an in-state party is not enough alone to establish the requisite minimum contacts, *Burger King*, 471 U.S. at 478, "prior negotiations and contemplated future consequences, along with the terms of the contract and the

parties' actual course of dealing" may indicate the purposeful availment that makes litigating in the forum state foreseeable to the defendant. *Id*. at 479.

That much is true for all assertions of jurisdiction, general or specific. Where the defendant's contacts are more limited, such that specific jurisdiction is the only option, the suit must "arise out of" or "be related to" these minimum contacts with the forum state. This nexus is important, particularly in its application to the case at bar, because it aims to give "a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen*, 444 U.S. at 297. Potential defendants should have some control over—and certainly should not be surprised by—the jurisdictional consequences of their actions. Thus, when conducting business with a forum in one context, potential defendants should not have to wonder whether some aggregation of other past and future contacts will render them liable to suit there.

This still leaves the obvious question, however, of how to distinguish between those contacts out of which a suit "arises" and those contacts that are not sufficiently connected to a suit to be considered. Here, we have two alternative scenarios: the first, Hyatt's, portrays a continuous series of contacts between Coco and itself, all related to the Milan property and the future hotel, during which the details of the parties' legal relationship may have shifted; the second, Coco's, portrays two distinct transactions, one related to a possible joint venture, and the other related to a brokerage arrangement. This court has already rejected "a hybrid between specific and general jurisdiction" to deal with cases where a transaction seemed insufficient for specific jurisdiction but somehow grew out of multiple, unconnected contacts. *RAR*, 107 F.3d at

1277. Either Coco's contacts were sufficient, or they cannot be supplemented by prior unrelated acts. *RAR* went on to hold, relevantly to our inquiry:

> Admittedly, RAR's suit is, in a certain sense, related to Turner's contacts with Illinois, if only because Turner never would have come to handle the engines in Scotland had it not previously dealt with RAR in Illinois. We do not think, however, that using such a loose causal connection between a suit and a defendant's forum contacts as the basis for personal jurisdiction comports with fair play and substantial justice.

*Id.* In *RAR* we agreed with the Third Circuit's position in *Vetrotex Certainteed Corp. v. Consolidated Fiber Glass Prods. Co.*, 75 F.3d 147 (3d Cir. 1996) that it is only the "dealings between the parties in regard to the disputed contract" that are relevant to minimum contacts analysis. *Id.* at 153.

We agree with Hyatt that the relevant set of dealings between itself and Coco encompass the parties' entire course of conduct with respect to the Milan hotel. But for Coco's initial efforts, he would have never come into the position of a broker at a point after the partnership faltered. The contacts from which Coco claims a fee directly arise out of his course of dealings with Hyatt. Hyatt's interest—elicited by Coco, and based on which he now seeks a fee—was all along in the development of a property in downtown Milan; it cannot now be dissected into two purportedly unrelated events, one in which Coco was a putative partner, and another in which he was a secondary figure.

Interestingly, Coco himself apparently has argued for a unitary reading of the events in the suit he filed with the Civil Court of Milan. In his Italian complaint, Coco asserts that the string of meetings and correspondence led to the interest of Hyatt in the property, and he avers

specifically that "all the teleconferences between the parties, the visits, the on-site inspections to the real estate, the documents and, more specifically, the e-mail dated July 13th, 1999 prove that a contract of brokerage has been entered into pursuant to Art. 1326 of the Italian Civil Code." We are concerned at this indication that Coco may have asserted one set of facts in the U.S. courts to defeat this suit, and another set of facts in the Italian courts to win on essentially the same claim. To the extent he is merely pleading inconsistently, this is not a problem from the point of view of the U.S. courts. See FED. R. CIV. P. 8(e)(2). If Coco prevails in one case on the basis of a position inconsistent with one he takes later, juidical estoppel would potentially apply. See *Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1548 (7th Cir. 1990). Furthermore, if the Italian proceedings terminate first, a question of recognition and enforcement of the foreign judgment will arise. Because we are upholding personal jurisdiction, we do not believe it necessary to explore this point further at this time.

## C.  *Forum Non Conveniens*

The third ground on which Coco moved to dismiss, which he presents on appeal as an alternate ground for affirmance, was the doctrine of *forum non conveniens.* Under that judge-made rule, a court may dismiss a case if an alternative forum is available and if dismissal would serve the interests of justice, even if the case is properly before it from the technical standpoint of subject matter and personal jurisdiction. *Kamel v. Hill-Rom Co.*, 108 F.3d 799, 802 (7th Cir. 1997). While, with respect to cases wholly within the system of U.S. federal courts, the doctrine has been largely replaced by the transfer of venue statute, 28 U.S.C. § 1404(a), it remains available as a ground for dismissal when a foreign court provides a more convenient forum. 15A Charles Alan Wright, Arthur

R. Miller & Edward H. Cooper, *Federal Practice and Procedure*, § 3914.12, p. 726 (2d ed. 1992). See, *e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981); *In re Union Carbide Corp. Gas Plant Disaster,* 809 F.2d 195 (2d Cir. 1987).

A *forum non conveniens* analysis takes place in two steps. First, the court must determine whether an adequate alternative forum is available; second, it must weigh several private and public interest factors related to the proper location for the litigation. The first inquiry requires a finding that all the parties are within the jurisdiction of the alternative forum and are amenable to process there. Here, Italy is of course the proposed alternative forum, and it is clear that the Italian courts (specifically the courts of Milan) are available; indeed, Hyatt did not challenge jurisdiction in the parallel Italian proceeding. Furthermore, it appears that the Italian courts are quite capable of providing a remedy to either party. Mr. Delli Santi, a reputed member of the Italian bar, submitted an affidavit on the propriety of the Milan forum and the availability of the remedy and the defenses that are relevant to this case under Italian law—precisely the kind of evidence needed to show the adequacy of a foreign forum. *Kamel*, 108 F.3d at 803. From this standpoint also, therefore, Italy seems to provide an acceptable alternative. (We note here that even if this declaratory action were to proceed in Illinois, under Illinois choice of law rules it is possible—perhaps even likely—that Italian law would apply.)

We move therefore to the second inquiry. The district court never conducted the balancing of public and private interests that is normally required in a *forum non conveniens* case. See, *e.g.*, *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-09 (1947); *Piper*, 454 U.S. at 257. This is an exercise far better suited to the district court. Although we recognize that we have the power to decide it nonetheless,

see *AAR Int'l, Inc. v. Nimelias Enters. S.A.*, 250 F.3d 510, 527 (7th Cir. 2001), particularly because the parties fully argued the issue both before the district court and here, we think that the wiser course is to allow the district court to consider this issue in the first instance on remand.

A note is in order, however, with respect to the "convenience of the parties" analysis. When a plaintiff chooses her own forum, it is normally reasonable to assume that the choice is convenient. *Piper*, 454 U.S. at 256. The plaintiff is, after all, master of the complaint, *Neuma, Inc. v. AMP, Inc.*, 259 F.3d 864, 880 (7th Cir. 2001), and this includes the choice of where to bring suit. In normal instances, therefore, a certain deference is due to the plaintiff's choice of forum with respect to convenience. See, *e.g.*, *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 553 (7th Cir. 2001). In the case of a declaratory judgment action, however, that principle has less force: but for Hyatt's preemptive filing in Illinois, this would be in all respects Coco's suit, and he would have been entitled to file whenever he wanted, wherever he wanted. He is the "natural plaintiff"—the one who wishes to present a grievance for resolution by a court. *Tempco Elec. Heater Corp. v. Omega Eng, Inc.*, 819 F.2d 746, 749-50 (7th Cir. 1987). We have expressed wariness at the prospect of "a suit for declaratory judgment aimed solely at wresting the choice of forum from the 'natural plaintiff.'" *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir. 1993). It is quite clear from Coco's arguments, and from his having filed suit in Italy, that Illinois is not his forum of preference. This is only one of many considerations the district court will wish to take into account, and we do not mean by this observation to limit the court's discretion otherwise when it considers this point.

**IV**

For these reasons, we REVERSE the district court's judgment and REMAND for further proceedings in accordance with this opinion.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*
