In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 02-2431 & 02-2574

GEORGE ZELINSKI, JR. and PIN BREAKER, INC.,
an Illinois corporation,

*Plaintiffs-Appellees,*
*Cross-Appellants,*

*v.*

COLUMBIA 300, INC., a Texas corporation,

*Defendant-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Central District of Illinois.
No. 98 CV 1059—**Joe Billy McDade**, *Chief Judge.*

ARGUED FEBRUARY 24, 2003—DECIDED JULY 10, 2003

Before BAUER, RIPPLE, and EVANS, *Circuit Judges.*

EVANS, *Circuit Judge.* Columbia 300 sold bowling balls and manufactured boxes under the federally registered mark "Pin Breaker"—without the written permission of George Zelinski, Jr., the owner of the mark. Zelinski and Pin Breaker, Inc. (which Zelinski co-owns with his father) sued Columbia and won actual and punitive damages. The parties filed post-trial motions and, while Columbia still lost the war, it won a major battle when the dis-

trict court vacated the punitive damages award. Both parties appeal.

In 1990 Zelinski and his father founded Pin Breaker, Inc., a small company that manufactured and sold high-end bowling balls. For 6 years, Zelinski and Pin Breaker, Inc. (we'll refer to both as "Zelinski") sold Pin Breaker balls domestically and internationally. In 1996 another corporation made Zelinski a lucrative offer for his manufacturing equipment. The offer came at a good time because Joseph Gentiluomo had recently sued Pin Breaker in an industry-wide patent infringement lawsuit.[1] Zelinski wanted to stop manufacturing balls during the pendency of the suit, so he accepted the offer.

Despite selling his manufacturing equipment, Zelinski didn't exit the bowling ball industry entirely. While talking to people at Columbia 300 about defense efforts in the *Gentiluomo* lawsuit, Zelinski began discussing Pin Breaker's ball technology and whether Columbia might be interested in producing Pin Breaker balls. Negotiations continued during an in-person meeting in October 1996. The parties signed a confidentiality agreement and Zelinski gave Columbia samples of his ball chemistry to test. Zelinski also showed Columbia an invoice from B.S. Hong, Pin Breaker's distributor in Korea, requesting a certain number of balls in specific types and colors. Although the parties discussed possible royalty arrangements, the meeting concluded without a written agreement, and talks continued in the following months. In March 1997, at Columbia's request, Zelinski sent it sample Pin Breaker boxes. Still, no written agreement was reached. Zelinski proceeded to discuss producing Pin Breaker balls with two other bowling ball companies.

---

[1] As of 2002, some remnants of this litigation were still ongoing. *See Gentiluomo v. Brunswick Bowling and Billiards Corp.*, 36 Fed. Appx. 433, 2002 WL 1216621 (Fed. Cir. 2002).

Time passed, and in January 1998, Zelinski was at a bowling pro-shop and discovered a Pin Breaker box that he didn't recognize. The design of the Pin Breaker logo was different, the logo's ® had been changed to a ™, and the identifying information, warranties, and certification from the American Bowling Congress and Women's International Bowling Congress had been eliminated. To add insult to injury, the ball in the box was a low-quality Columbia second, the "Bonanza."

Zelinski investigated and found out that Columbia was behind the Pin Breaker box and had proceeded full steam ahead with producing balls under the Pin Breaker name. Following the October 1996 meeting, Columbia talked to Hong and Myung Kwon, Pin Breaker's overseas shipping agent, and they decided to add names and colors to Pin Breaker balls. In addition to implementing changes to the appearance of the Pin Breaker balls, Columbia also changed the quality of the balls. Unlike the high-end balls that Zelinski had produced, Columbia used less expensive cores and created cheap plastic balls or shoddy mid-level balls prone to cracking. Columbia sold 2,580 of these balls to Hong for South Korean distribution and 496 to the Asia Merchandise Company for distribution in Taiwan.

Columbia also created generic Pin Breaker boxes for the balls. As Zelinski had discovered, Columbia used some of the leftover boxes to ship its own Bonanza balls. Although Columbia put Bonanza stickers on the Pin Breaker boxes, the stickers did not cover up the Pin Breaker mark. Columbia didn't tell Zelinski about any of the meetings it had with Hong and Kwon or the changes it had made to the Pin Breaker balls and boxes. In fact, during a customs snafu, Columbia even told Kwon not to contact Zelinski because it was in charge of the Pin Breaker line.

Around the time of Zelinski's investigation, Columbia learned that it had failed to pay him any royalties. Although Columbia offered to send Zelinski a check, he refused to accept the payment. Zelinski did ask Columbia to destroy its leftover Pin Breaker boxes. Although Columbia promised to do so, Zelinski found a stash of Pin Breaker boxes in Columbia's warehouse during discovery for this suit—2 years later.

Zelinski filed suit in the Central District of Illinois, asserting federal claims of trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1114(1) and § 1125(a), state law claims under the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.*, and the Illinois Consumer Fraud Act, 815 ILCS 505/2 *et seq.*, and a common law claim of unfair competition. Prior to trial, Chief Judge Joe Billy McDade partially granted Zelinski's motion for summary judgment, subject to Columbia's success at trial on its affirmative defenses and a factual finding whether a contract existed between the parties. During trial, Columbia moved for a directed verdict on its abandonment affirmative defense and to exclude punitive damages and damages based on corrective advertising. The district court denied these motions and the jury found in favor of Zelinski, awarding him $70,000 in actual damages for corrective advertising and lost royalties and $710,000 in punitive damages.

After trial, Columbia made a renewed motion for judgment as a matter of law and Zelinski moved to alter or amend the judgment. Columbia had only one victory, but it was a big one—the district court eliminated the punitive damages award. Zelinski's motion sought various forms of injunctive relief, such as preventing Columbia from using the Pin Breaker mark and destroying anything that bore the mark, which Columbia did not oppose. He also requested treble his actual damages, attor-

neys fees, costs in bringing the action, and pre-judgment interest. The district court granted Zelinski costs and pre-judgment interest but denied the remainder of his motion.

Both parties appeal the district court's decision on their motions. We'll start with the decision partially granting Columbia's renewed motion for judgment as a matter of law, which we review *de novo. See Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). The parties' arguments primarily focus on the jury's findings. When reviewing a jury verdict, "the question is not whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict." *See id.* Overturning a jury verdict is a "hard row to hoe." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043 (7th Cir. 1999).

Because Columbia's affirmative defenses are potentially dispositive of this case, we'll start there. Columbia argues that the jury wrongly rejected its acquiescence and abandonment defenses. We can make short work of the acquiescence defense because Columbia failed to move for a directed verdict on that issue. As the district court pointed out during its review of Columbia's post-trial motion, that is a prerequisite to judgment as a matter of law. *See McCarty v. Pheasant Run, Inc.*, 826 F.2d 1554, 1555-56 (7th Cir. 1987) (citing Fed. R. Civ. P. 50(b)). Columbia does not address this problem. We've examined the record ourselves and can't find any sign that Columbia made an oral or written motion regarding acquiescence. Under these circumstances, Columbia has waived review of this issue.

Columbia did preserve review of its abandonment defense. Under 15 U.S.C. §1127, Columbia had a presumption of abandonment because Zelinski let his mark lie dormant for three consecutive years. Zelinski can rebut

this presumption with "evidence explaining the nonuse or demonstrating the lack of an intent not to resume use." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 955 (7th Cir. 1992). Zelinski's mere statement that he didn't abandon his mark is insufficient. *See Imperial Tobacco Ltd., Assignee of Imperial Group PLC v. Philip Morris, Inc.*, 899 F.2d 1575, 1581 (Fed. Cir. 1990) ("In every contested abandonment case, the respondent denies an intention to abandon its mark; otherwise there would be no contest.").

Zelinski had more than his own say-so to rebut Columbia's presumption of abandonment. Specifically, he relies on the *Gentiluomo* lawsuit. While Zelinski did testify that he thought the lawsuit was frivolous and fraudulent, the jury could still have reasonably found that he was concerned about it having a significant financial impact on his business. This is particularly true when the jury was aware that the suit had enough substance that it was still lingering on at the time this case was tried. Although the *Gentiluomo* suit didn't stop Columbia from making bowling balls, a jury could conclude that a small company might be more cautious than Columbia, one of the world's largest bowling ball producers. In addition to explaining his non-use, Zelinski demonstrated that he intended to resume using the Pin Breaker mark. Starting in 1997, Zelinski discussed producing Pin Breaker balls with two other bowling ball companies. So, while Columbia does have some evidence to support its abandonment theory, the evidence the jury heard was not so one-sided that the only conclusion it could have reached was that Zelinski abandoned his mark. The jury had a reasonable basis to reject Columbia's abandonment defense.

Although Columbia's affirmative defense arguments haven't gone anywhere, it has another weapon in its arsenal. Columbia argues that Zelinski isn't entitled to

the monetary damages he received for corrective advertising and lost royalties. To recover damages, Zelinski must show that the violation caused actual confusion among his customers and, as a result, he suffered actual injury. *See Web Printing Controls Co. v. Oxy-Dry Corp.*, 906 F.2d 1202, 1205 (7th Cir. 1990). Columbia finds Zelinski's evidence of actual confusion and actual injury lacking and also questions the quality of his expert testimony.

Zelinski's testimony of actual confusion is not overwhelming (two people saw Columbia balls in Pin Breaker boxes and were possibly confused about Pin Breaker's relationship with Columbia). But under the circumstances of this case, it is sufficient. Columbia sold balls labeled Pin Breaker in Pin Breaker boxes. Columbia wasn't mentioned anywhere on the box. Why would a customer think he purchased anything other than a Pin Breaker ball? Columbia argues that Zelinski was not manufacturing or selling new balls when it sold balls under the Pin Breaker label. There is no reason, however, the average customer would have been aware of this fact. The jury is entitled to use its common sense to reason that purchasers of Columbia's Pin Breaker balls were deceived. This is particularly the case when no amount of inspection would have revealed that Columbia—not Pin Breaker—manufactured the balls. *See Getty Petroleum Corp. v. Island Transp. Corp.*, 878 F.2d 650, 656 (2nd Cir. 1989) (proof of actual confusion unnecessary when non-Getty gasoline was sold to consumers under the Getty trademark and purchasers had no way of learning it was not Getty gasoline).

Columbia's next argument is that Zelinski hasn't suffered an actual injury because he isn't producing anything now and wasn't producing anything at the time of Columbia's infringement. At trial, Zelinski argued that he was injured because he lost royalties and will have to spend

money on corrective advertising. Lost royalties aren't dependent on Zelinski's current production status. Corrective advertising to rehabilitate an unused mark may seem unnecessary, but Zelinski intends to resume use of his mark. The jury could reasonably find that Zelinski was actually injured.

Columbia's last shot at the damages issue takes aim at the testimony of J. Timothy Cromley, Zelinski's damages expert. Columbia contends that the district court should not have admitted his testimony—a decision we review only for abuse of discretion. *See Bourelle v. Crown Equip. Corp.*, 220 F.3d 532, 535 (7th Cir. 2000) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)). *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires judges to determine that scientific testimony offered under Federal Rule of Evidence 702 is both relevant and reliable, 509 U.S. at 589, an inquiry required also for technical and other specialized expert testimony, *Kumho Tire Co., Ltd.*, 526 U.S. at 149. To gauge reliability, the district judge must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

The relevance of Cromley's testimony and his qualifications are not in dispute. Columbia only quibbles with three aspects of his methodology. First, Cromley conceded that the cost of corrective advertising would be the same no matter how many bowling balls Columbia sold under the Pin Breaker name in Korea. This is correct. The number of infringing balls sold effects the *reasonableness* of an expansive corrective advertising campaign, but it doesn't effect the costs of running rehabilitative ads in trade magazines. In this case, it wasn't unreasonable for Cromley to recommend a corrective advertising cam-

paign when Columbia sold slightly over 3,000 balls in Korea and Taiwan.

Columbia's second beef is with the way Cromley tested the reasonableness of repairing Zelinski's mark. To justify damages for corrective advertising, Zelinski had to show that "repair" of the old trademark, rather than adoption of a new one, is the least expensive way to proceed. *See Zazu Designs v. L'Oreal, S.A.*, 979 F.2d 499, 506 (7th Cir. 1992). After Cromley determined how much it would take to rehabilitate Zelinski's mark, he compared that number with Pin Breaker's projected income for the next 20 years—which included years that the company wasn't in business. That does seem a little odd, but Cromley knew that Zelinski had closed his plant, and he still opined that this was an accepted way to confirm the reasonableness of repair. Cromley fully explained his methodology, and Columbia didn't present evidence that would suggest an expert wouldn't use this technique.

Columbia's final complaint focuses on Cromley's lost royalties testimony. Columbia had different royalty rates for balls it produced, depending on the type of ball. Although Columbia mainly sold balls with the cheaper royalty rates, Cromley used the royalty rate for the most expensive ball to determine Zelinski's lost royalties. Columbia failed to dispute Cromley's royalties calculation before the district court. To the extent that this issue might be included in Columbia's general challenge to Cromley's testimony, Zelinski would have tried to get the best rate possible, so it is not beyond reason for Cromley to rely on that rate in his calculations. This does not show that Cromley's testimony is inherently unreliable.

To sum up, the district court did not abuse its discretion admitting Cromley's testimony based on any of Columbia's asserted reasons. Columbia makes a passing reference in its brief to whether Cromley's testimony

was sufficient to support the jury's verdict. This argument was not before the district court or fleshed out at all in Columbia's analysis, so we aren't exactly sure what additional evidence Columbia thinks the jury needed. For what it's worth, we find Cromley's testimony sufficient for a jury to reasonably determine that corrective advertising was reasonable and worth doing, and the amount of lost royalties.

Although we are done with Columbia's damages arguments, we're not quite ready to leave the subject. Zelinski contends that the district court wrongly vacated the jury's punitive damages award. The district court found that Columbia had "some reasonable basis for believing that it had an agreement" to fill orders in Korea and, in that case, "there is no evidence sufficient to show that [Columbia's] conduct was willful or grossly negligent as to indicate a wanton disregard of the rights of others." While overturning a jury verdict is not something that district courts do with regularity, we agree with Judge McDade here that the evidence in this case did not support punitive damages.

Under Illinois law, punitive damages are disfavored. *See Smith v. Prime Cable of Chicago*, 658 N.E.2d 1325, 1336 (Ill. App. 1995). They are only recoverable "where the alleged misconduct is outrageous either because the acts are done with malice or an evil motive or because they are performed with a reckless indifference toward the rights of others." *Id.* Ordinary negligence will not support an award of punitive damages, therefore Zelinski must prove more than "mere inadvertence, mistake, errors of judgment and the like." *Loitz v. Remington Arms Co.*, 563 N.E.2d 397, 402 (Ill. 1990). The focus of our inquiry is on Columbia's conduct. Zelinski must show that Columbia exhibited a conscious and deliberate disregard for the rights of others. *See Burke v. 12 Rothschild's Liquor Mart, Inc.*, 593 N.E.2d 522, 531 (Ill. 1992).

Judge McDade concluded that Zelinski didn't make this showing because Columbia reasonably believed it had an oral agreement to sell Pin Breaker balls in Korea. George Zelinski, Sr. apparently started this misunderstanding when he met Columbia's president at a trade show and introduced him to Hong and Kwon. Zelinski, Sr. then brought up the possibility of making low-end balls for the Korean market. When Zelinski met with Columbia representatives in October 1996, he brought along an invoice from Hong requesting specific quantities and styles of bowling balls. The parties discussed the fact that Columbia could produce the balls and the amount of royalties it might pay. Zelinski gave Columbia Hong's contact information and, according to Columbia, told it to contact Hong regarding Pin Breaker orders. Columbia contacted Hong and produced the balls that he sought. During this time, Columbia requested sample boxes from Zelinski so that it could create its own boxes for the balls. He provided the boxes—without questioning why Columbia would need them.

Zelinski argues that the district court ignored much of the evidence in his favor. We have looked at this evidence, however, and we still reach the same conclusion as the district court. First, we are concerned with Columbia's state of mind, so testimony regarding how Zelinski operated or what he thought is irrelevant. Second, much of Zelinski's evidence shows that Columbia's representatives were negligent, not that they had a conscious and deliberate disregard for the rights of others. For example, Kyle Burns, director of International Sales, and Brad Hunt, director of Research and Development, both testified that they thought a deal to sell balls in Korea had been struck but that the other person would handle any necessary contracts—so neither of them ended up doing anything. Another example of this is that Columbia made sweeping changes to Zelinski's balls and produced

generic Pin Breaker boxes without telling him. Columbia probably made an error in judgment by not maintaining closer communication with Zelinski. Its actions are consistent, however, with Columbia's position that it had the green light to fill Hong's orders—and produce balls that met his specifications. Negligence also explains the timing of Columbia's offer to pay royalties. While this occurred as Zelinski was investigating Columbia's actions, there is no indication that Columbia knew of the investigation and decided to try to pay royalties in an effort to hide its misdeeds. Rather, an email from Burns to Hunt shows that the royalty payment is something else that simply fell between the cracks. Finally, Columbia showed that some of Zelinski's complaints are just about its normal business practices. Although Zelinski contends that using the leftover Pin Breaker boxes for shipping Columbia seconds shows malice, no one disputed that Columbia normally uses leftover boxes for shipping its balls. Furthermore, Columbia attempted to cover up the Pin Breaker name with labels for its ball—it didn't represent that these seconds were Pin Breaker products. After culling through Zelinski's evidence, Columbia's most inexplicable actions are why it made such sweeping changes to the appearance of the boxes and why, after Zelinski asked, it didn't destroy the remaining boxes. Neither of these facts, however, rise above negligence to show malice or an intent to deceive. *See Martin v. Heinold Commodities, Inc.*, 643 N.E.2d 734, 756-57 (Ill. 1994) (punitive damages warranted when broker disguised commission as "foreign service fee," act was intentional deception that involved an element of outrage similar to that usually found in crime). We agree with the district court: Zelinski did not put forth sufficient evidence to recover punitive damages.

We can quickly deal with the parties' two remaining issues. Zelinski thinks the district court should have

granted his motion to alter or amend the judgment and awarded him treble damages and attorneys fees. We review the district court's decision for abuse of discretion. *See Zivitz v. Greenberg*, 279 F.3d 536, 539 (7th Cir. 2002). Under the Lanham Act, 15 U.S.C. § 1117(b), treble damages and attorneys fees must be awarded if an infringer's violation "consists of intentionally using a mark or designation, knowing such mark or designation is a counterfeit mark," unless there are "extenuating circumstances." As we have discussed, the evidence does not support a finding that Columbia intentionally used a mark that it knew to be counterfeit. Rather, the evidence indicates that Columbia negligently infringed on Zelinski's mark because its representatives believed an oral agreement allowed it to fill orders on Zelinski's behalf. Denying treble damages and attorneys fees was not an abuse of discretion.

Finally, Columbia complains that the district court should have granted its forum non conveniens motion, mainly because it has a similar case pending in Texas state court. This decision is also reviewed for abuse of discretion. *See Wilson v. Humphreys (Cayman) Ltd.*, 916 F.2d 1239, 1245 (7th Cir. 1990). A forum non conveniens analysis takes place in two steps. First, the court must determine whether an adequate alternative forum is available; second, it must weigh several private and public interest factors related to the proper location for the litigation. *See Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 718 (7th Cir. 2002). There is a strong presumption in favor of the plaintiff's choice of forum. *See Wilson*, 916 F.2d at 1245. While Columbia can show that an adequate alternative forum is available in Texas state court, none of its arguments on the private and public interest factors overcome the presumption in favor of Zelinski. The fact that the district court tried this case to a conclusion indicates that Zelinski's forum of choice was, if not convenient for Columbia, at least workable. Furthermore, at this point the pub-

lic interest certainly would not be well-served by deciding to jettison the untold hours of work put into this case by Chief Judge McDade and his staff, Magistrate Judge Bryon G. Cudmore and his staff, the clerk's office of the Central District of Illinois, the citizens who served as jurors, and everyone else who got this case through trial. *See McLennan v. American Eurocopter Corp., Inc.*, 245 F.3d 403, 423-24 (5th Cir. 2001) (moving party must demonstrate great prejudice to get case dismissed post-trial). Columbia's best argument at the time it filed its motion was that its sister entity, Columbia Industries, Inc., filed a breach of contract action against Zelinski based on the same facts underlying this case in Texas state court, and it would be efficient to resolve all of the claims at one time and in one court. Although the state court action was filed in March 2001, Columbia did not file its forum non conveniens motion until August 2001. At that time, trial was scheduled less than a month away. The district court did not abuse its discretion in denying the motion.

For the above reasons, the decision of the district court is AFFIRMED.

RIPPLE, *Circuit Judge*, concurring in part and dissenting in part. I respectfully part company with my colleagues on the issue of punitive damages. In my view, the evidence permitted the jury to reach the decision that it reached. Columbia was, according to the evidence, either very negligent for a company of its size and sophistication or it attempted to steal Pin Breaker's business in a calculated fashion that clearly warrants punitive dam-

ages. The jury heard the evidence and decided that punitive damages were warranted. I would not second guess that determination.

In all other respects, I am pleased to join my colleagues' excellent opinion.

A true Copy:

       Teste:

                       _____

                       *Clerk of the United States Court of*
                           *Appeals for the Seventh Circuit*