DeKALB CHIROPRACTIC CENTER, INC., Appellant–Defendant,

v.

BIO–TESTING INNOVATION, INC., Appellee–Plaintiff.

No. 17A05–9605–CV–208.

Court of Appeals of Indiana.

April 8, 1997.

Rehearing Denied June 17, 1997.

John C. Grimm, Grimm & Grimm, Auburn, for Appellant.

James L. Wieser, Jill S. Seddon, Wieser & Sterba, Schererville, for Appellee.

## OPINION

BARTEAU, Judge.

DeKalb Chiropractic Center, Incorporated (Chiropractic Center) challenges the trial court's judgment in favor of Bio–Testing Innovation, Incorporated (Bio–Testing) in an action involving a contract for the lease of medical equipment. The terms of the contract required Chiropractic Center to perform a minimum number of tests on patients each week. The sole issue presented by Chiropractic Center is: Did the trial court err when it failed to determine that the contract was in contravention of public policy and therefore unenforceable?

### FACTS

Bio–Testing, an Indiana corporation, was formed in 1989 by Dr. Paul A. Mandich and Dr. Benoit O. Choiniere for the purpose of leasing medical equipment. On May 18, 1989, Bio–Testing executed a contract with Dr. Lester J. Rekeweg, on behalf of Chiropractic Center, providing for the lease of two strength-testing units. The contract required Chiropractic Center to test all patients no later than the patient's second office visit and to retest each patient thirty days after the first testing. The contract also required Chiropractic Center to provide the information necessary to allow Bio–Testing to file insurance claims for patients who had been tested with the equipment. The leasing contract did not include the prices that Bio–Testing would charge for each test. The contract also provided that Bio–Testing would pay Chiropractic Center twenty-five percent of the amounts received from claims filed and collected from Chiropractic Center's patients. The term of the contract was for 1000 billable examinations (or 500 billable examinations if performed in the first six months after installation of the equipment), after which time Chiropractic Center could purchase the equipment for one dollar.

Dr. Rekeweg testified that he used the equipment six to eight times in 1989, but stopped using it because he believed the equipment did not provide accurate testing results and because, after speaking with a patient concerning the patient's bill, he believed that Bio–Testing was billing the health insurance companies unreasonable amounts for the tests.[1]

In late 1989, Bio–Testing mailed Dr. Rekeweg a second contract that was intended to supersede the previous contract. The second contract was substantially similar to the first, although it did not contain language requiring Chiropractic Center to test each patient before his or her second office visit and to retest each patient. Instead, the contract required Chiropractic Center to perform a minimum number of billable examinations each week.[2] Dr. Rekeweg and Bio–Testing

---

1. Bio–Testing billed $250 for each muscle strength test performed on a patient's upper or lower extremity. When a particular electrical test was conducted, Bio–Testing billed $300 for the testing of each extremity. Dr. Choiniere and Dr. Rekeweg each testified that Bio–Testing ac-

cepted full assignment from a patient's insurance company, i.e., Bio–Testing did not charge a patient for the amount above that paid by the patient's insurance company.

2. The contract states:

executed the second contract on January 1, 1990.[3]

When Dr. Rekeweg failed to test patients after execution of the second agreement, Bio–Testing filed suit against Chiropractic Center, alleging breach of the contract. Pursuant to the remedies outlined in the leasing contract, Bio–Testing sought the immediate purchase of the equipment by Chiropractic Center and attorney fees. Chiropractic Center answered, asserting as an affirmative defense that the contract controverted public policy and was unenforceable. On December 12, 1995, the trial court entered findings of fact and conclusions of law on its own motion awarding Bio–Testing $11,975 in damages for the breach and $2,552.25 in attorney fees. Chiropractic Center timely filed a motion to correct errors, which the trial court denied on February 12, 1996.

## STANDARD OF REVIEW

When reviewing a trial court's specific findings of fact and conclusions of law, we first determine whether the evidence supports the findings and then whether the findings support the judgment. *In re Estate of Burmeister,* 621 N.E.2d 647, 649 (Ind.Ct. App.1993). Findings of fact are clearly erroneous when the record lacks any evidence or reasonable inferences from the evidence to support them. *Id.*

When, as in the present case, the trial court enters specific findings on its own motion, those findings control only as to the issues they cover, while a general judgment standard applies to any issue upon which the court has not found. *Id.* We may affirm a general judgment on any theory supported by the evidence adduced at trial, and we will neither reweigh the evidence nor judge the credibility of the witnesses. *Real Estate*

*Support Servs., Inc. v. Nauman,* 644 N.E.2d 907, 909 (Ind.Ct.App.1994), *trans. denied* (1995); *Hamlin v. Steward,* 622 N.E.2d 535, 538 (Ind.Ct.App.1993). In reviewing the judgment, we consider the evidence most favorable to the appellee and will reverse only if the evidence entitles the appellant to a finding in his favor as a matter of law. *Hamlin v. Steward,* 622 N.E.2d at 538. Further, because Chiropractic Center appeals from a negative judgment, in order to prevail it must show that the uncontradicted evidence leads to one conclusion and that the trial court reached the opposite conclusion. *Id.*

## VALIDITY OF THE CONTRACT

Chiropractic Center contends the trial court erred when it failed to conclude that the leasing contract was contrary to public policy and therefore unenforceable.

Indiana courts recognize the freedom of parties to enter into contracts and presume that contracts represent the freely bargained agreement of the parties. *Fresh Cut, Inc. v. Fazli,* 650 N.E.2d 1126, 1129 (Ind.1995). This reflects the principle that it is in the best interest of the public not to unnecessarily restrict persons' freedom of contract. *Id.*

Despite this very strong presumption of enforceability, courts have refused to enforce private agreements that contravene statute, clearly tend to injure the public in some way, or are otherwise contrary to the declared public policy of Indiana. *Id.* at 1130. Whether or not a contract is against public policy is a question of law for the court to determine from all of the circumstances in a particular case. *Pigman v. Ameritech Pub., Inc.,* 641 N.E.2d 1026, 1030 (Ind.Ct. App.1994). In the present case, the mini-

Month 1 There will be no minimum for examinations performed during the first month following installation; this shall be considered the start-up period.
Months 2–3 10 billable examinations per week. The parties anticipate that their examinations will be derived from a combination of testing.
Months 4–6 15 billable examinations per week derived from a combination of testing.
Months 7–up 20 billable examinations per week derived from a combination of testing.

R. 253. Under the terms of the contract, testing of either the upper extremities or the lower extremities constituted one examination, while testing of both extremities constituted two examinations. Testing of both the upper and lower extremities constituted a combination of testing.

3. Dr. Rekeweg testified at his deposition that he signed the agreement "to buy time" because Bio–Testing "was going to give him another alternative." R. 175.

mum testing requirements contained in the contract between Bio–Testing and Chiropractic Center are inconsistent with two well-established public policy considerations: 1) protecting the integrity of the doctor/patient relationship and 2) containing health care costs. *See Hooks SuperX, Inc. v. McLaughlin,* 642 N.E.2d 514, 518 (Ind.1994) (listing the protection of the physician/patient relationship and the avoidance of unnecessary health care costs as policy considerations supporting pharmacists' duty to cease supplying prescription for a dangerous drug refilled at unreasonable rate pending directions from prescribing physician).

 The leasing contract is in direct conflict with the public policy of protecting the doctor/patient relationship because the agreement required Chiropractic Center to conduct a minimum number of tests each week without regard to the needs of Chiropractic Center's patients. The agreement did not allow Chiropractic Center's doctors to determine whether an individual patient might benefit from testing, but required the doctors to either perform a prescribed number of tests each week or risk breaching the contract. Because the contract intruded upon the doctor/patient relationship, robbing Chiropractic Center's doctors of their professional judgment and discretion in treating patients, it was in violation of public policy and unenforceable.

The minimum testing requirements in the lease agreement also conflict with Indiana's policy of containing health care costs. In consideration for the use of the equipment, Chiropractic Center agreed to conduct a certain number of tests and then provide billing information to Bio–Testing. Bio–Testing, in turn, would bill the insurance company and, upon receiving the insurance proceeds, provide Chiropractic Center with twenty-five percent of the amount received. The terms of the contract required exploitation of the health insurance industry. The fees contemplated by the contract more than covered the cost of Bio–Testing's original purchase and Chiropractic Center's use of the medical equipment.[4] Essentially, the health insurance industry, and not Chiropractic Center, was the party paying the consideration supporting the lease. The harm resulting from such an agreement is self-evident. Such contracts not only unnecessarily charge insurers, but raise health care costs, thereby jeopardizing equal access to health care. For these additional reasons, we determine that the lease agreement was contrary to public policy and unenforceable.

Accordingly, we reverse the judgment of the trial court.[5]

HOFFMAN, J., and SHARPNACK, C.J., concur.

---

**4.** It appears from the evidence that Bio–Testing also charged the insurance companies highly unreasonable amounts for the testing. Although Bio–Testing originally paid only $12,000 for the equipment, it expected the insurance companies to pay a minimum of $250,000, and a maximum of $300,000, for testing over the life of the contract.

**5.** Due to our conclusion that the contract between Bio–Testing and Chiropractic Center was unenforceable, we do not address Bio–Testing's assertion that it is due additional attorney fees under the terms of the agreement.