Ronald A. COHEN, D.D.S., M.S.D.
Cohen Orthodontic Group,
P.C.

v.

ORTHALLIANCE NEW IMAGE, INC.

No. 1:01 CV 352.

United States District Court,
N.D. Indiana,
Hammond Division.

March 24, 2003.

Richard M. Goldstein, Thomas A. Connop, Roger B. Cowie, Christopher M. LaVigne, Brian A. Colao, Locke Liddell and Sapp, Dallas, TX, William M. Pope, J. Michael Grubbs, Thomas F. Shea, Barnes and Thornburg, Indianapolis, IN, for Ronald A. Cohen, DDS MSD, Cohen Orthodontic Group PC, plaintiffs.

Sherry A. Fabina–Abney, Ice Miller, Indianapolis, IN, Stewart E. Niles, Jr., Joseph J. Lowenthal, Jr., Jones Walker Waechter Poitevent, Carrere and Denegre LLP, New Orleans, LA, for Orthalliance New Image Inc., defendant.

## ORDER

MOODY, District Judge.

In this action, the parties have cross-moved for summary judgment. During the time allotted for briefing the motions, this action was transferred from the Fort Wayne Division to the Hammond Division, at which time the random judicial assignment system placed the case before the undersigned. Upon review of the record compiled by the parties, the court resolves the pending motions as explained in the remainder of this Order.

## I. BACKGROUND

Cohen is a Doctor of Dental Surgery, who specializes in orthodontia. He practices his profession in Allen County, Indiana under the name Cohen Orthodontic Group, P.C. ("Cohen Orthodontic"), of which Cohen owns all outstanding stock. (*See* Pl. Desig. Of Evid. at Ex. B ("Complaint") at ¶¶ 4–5.)

Orthalliance New Image, Inc. ("New Image") is a Delaware corporation with its primary place of business in Torrance, California. (*See id.* at ¶ 3.) New Image manages orthodontic practices throughout the country. (*See* Def. Desig. of Evid. at Ex. 1 ("Summers Aff.") at ¶ 4.) As part of the furious consolidation experienced in the orthodontic practice management industry during 2000 and 2001, New Image was purchased by Orthalliance, Inc.[1] in an asset deal. (*See id.* at ¶ 20.) *See generally Top Public Companies: Orthodontic Centers of America, OCA now dominates field,* NEW ORLEANS CITY BUS., June 17, 2002, at 27, *available at* 2002 WL 12346069. Orthalliance, Inc. was subsequently acquired by another competitor, Orthodontic Centers of America. *See id.* Thus, Orthalliance, Inc. acts as both the parent of New Image and the subsidiary of Orthodontic Centers of America.

The relationship between Cohen and New Image began in early 1997. At the time, New Image[2] was a corporate infant, but eager to take advantage of the expanding market for orthodontic practice services. Cohen agreed to retire all stock in the professional corporation under which he was practicing orthodontia at the time, and to sell the non-medical business assets of the operation. (*See* Pl. Desig. of Evid.

---

[1] Orthalliance, Inc., also a citizen of Delaware and California, was named in the Complaint as a co-defendant (Compl. at ¶ 3), but subsequently dismissed without prejudice by way of party stipulation (Dkt. Entry # 16).

[2] Actually, the entity existing at the time was a corporate predecessor to the defendant in this action. The reader can ignore this detail.

at Ex. A ("Agreement and Plan of Merger") at § 2.2; Pl. Design. of Evid. at Ex. B.3, pp. 1.) In exchange, the precocious New Image tendered to Cohen 1,193,500 shares of preferred stock in New Image plus $511,500.00 cash. (*See id.*) Cohen also agreed to create a new professional corporation (which is the one appearing as a co-plaintiff in this action), and *cause the new entity to execute* a "Management Services Agreement" with New Image at Closing under which New Image would provide certain management services to the new professional organization Cohen agreed to establish for an initial period of forty (40) years. (*See id.* at § 2.8.)

On April 1, 1998, Cohen Orthodontic entered into the Management Services Agreement ("MSA") (Pl. Desig. of Evid. at Ex. B.1). New Image promised to provide a series of management consulting and related business services to Cohen Orthodontic. New Image also agreed to furnish materials and supplies reasonably necessary for Cohen Orthodontic to fulfill its professional mission. (*See* M.S.A. § at §§ 1.2, 2.1, 6.1–6.7.) In exchange, Cohen Orthodontic promised to pay fees for these services, the precise amount of which would be a percentage of the "net revenue" to Cohen Orthodontic. (*See id.* at Art. 9 ("Financial Arrangements").) Consistent with the Agreement and Plan of Merger, the parties agreed to a natural termination date of April 1, 2038. (*See id.* at § 12.1 ("The term of this Agreement shall commence on the date of this Agreement and shall expire on the fortieth (40th) anniversary of such date, unless earlier terminated pursuant to the terms of this Agreement.").) Cohen Orthodontic has cast doubt on the legality of several of the contractual obligations New Image has agreed to undertake, on account of amendments to the Indiana Dental Practices Act ("IDPA"), 2000 Ind. Acts P.L. 102, § 2 ("2001 Amendments"), enacted subsequent to the execution of MSA.[3]

Concomitant with the execution of MSA, Cohen Orthodontic also agreed to execute an employment contract with any affiliated orthodontist. Thus, on April 1, 1998, Cohen and Cohen Orthodontic did enter into such an agreement. (*See* Pl. Desig. of Evid. at Ex. B.2 ("Employment Agreement").) The fourteen-page document describes, in great detail, the parties' obligations. Noteworthy for purposes of this litigation is section 6.1, entitled "Covenant Not to Compete," which marks geographic and temporal limits on Cohen's for-profit orthodontic practice, should the present arrangement become unsettled. The enforceability of the covenant is an issue disputed by the parties in this summary judgment motion.

Also executed on April 1, 1998 was an Option Agreement. (*See* Pl. Desig. of Evid. at Ex. B.3 ("Option Agreement I").) In it, Cohen bestowed upon the "Optionee" a right to purchase all of Cohen's equity interest in Cohen Orthodontic. (*Id.* at pp. 1.) Since Cohen was the sole shareholder, he was ostensibly providing the "Optionee" with a right to buy Cohen Orthodontic in its entirety. Cohen himself was the "Optionee" of the call;[4] New Image was ex-

---

**3.** The amendments took effect July 1, 2001. In them, the Legislature expanded the definition of dental practice to include situations, as pertinent to this litigation, where a person: controls the use of dental equipment while it is being used for dental services, IDPA § 23(a)(11); interferes with a dentist's clinical judgment, *id.* at § 23(a)(12); or "[e]xercises direction or control" over "[f]inal decisions

relating to the employment of dental office personnel," *id.* at § 23(a)(13)(F).

**4.** *See* Restatement (Second) of Contracts § 9 cmt. a (1981) ("In one sense a person can make a promise to himself, but the law does not provide remedies for the breach of such promise.").

pressly named "a third-party beneficiary of rights of the Optionee." (*Id.*)

Around February 1, 2000, another Option Agreement ("Option Agreement II") was executed.[5] (*See* Pl. Desig. of Evid. at Ex. D ("Cohen Aff.") at ¶ 9.) In it, Cohen granted Dr. John G. Hamilton (named "Optionee") a call option for 100% of Cohen's stock in Cohen Orthodontic, exercisable upon any "Triggering Event" as the parties defined that term in section 2. New Image was again expressly named "a third-party beneficiary of rights of the Optionee." (Option Agreement II at preamble.) Cohen disputes the legality of vesting a call in Dr. Hamilton, a person who, according to Cohen is not a person eligible to own an interest in an orthodontic professional corporation under Indiana law, due to a change in his physical condition occurring subsequent to the execution of Option Agreement II. (*See* Stip. Concerning Dr. Hamilton at ¶ 3 ("Since May 18, 2000, Dr. Hamilton has been unable to engage in the practice of dentistry as a result of a brain tumor.").)

Approximately two months after the 2001 Amendments took effect, Cohen and Cohen Orthodontic (collectively referred to as "Plaintiffs") commenced this action in Allen County Superior Court. On September 26, 2001, New Image invoked its removal rights, placing this diversity case in the federal district court at Fort Wayne. On April 22, 2002, the undersigned issued an order in an unrelated case,[6] spurning the invitation to end the contractual relationship between an orthodontic group and New Image's parent company. *See Orthodontic Affiliates, P.C. v. OrthAlliance, Inc.*, 210 F.Supp.2d 1054 (N.D.Ind.2002).

Two weeks after the issuance of the opinion, New Image moved for a transfer of the action to the Hammond Division, 28 U.S.C. § 1404(a) ("For the convenience of the parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."). In an order dated June 24, 2002, Chief Judge Lee transferred this action to the Hammond Division, where it was exposed to the random judicial assignment procedure and routed to the undersigned.

The parties have submitted crossing summary judgment motions, asking the court to resolve whether Plaintiffs are entitled to a declaration on the future enforceability of this intricate contractual relationship Plaintiffs also ask the court to strike certain parts of the Summers Affidavit.

## II. LEGAL STANDARD

The parties have cross-moved for summary judgment, which the court may grant if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In a cross-motion posture, the court must bend any factual inferences in the direction of the party "against whom the motion under consideration is made." *Metropolitan Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002); *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir.1998). The local court rule, N.D.Ind.L.R. 56.1,

---

5. Option Agreement II states it was "made and entered into as of the 1st day of April 1998" (Pl. Desig. of Evid. at Ex. C at ¶ 1), but this assertion is apparently incorrect (*See* Cohen Aff. at ¶ 9; Summers Aff. at ¶ 23).

6. *See* N.D.Ind.L.R 40.1(d) (defining "related action" as one which either "(1) grows out of the same transaction or occurrence, (2) involves the same property, or (3) involves the validity or infringement of a patent, trademark, or copyright as is involved in a pending case.").

plays a complementary role in summary judgment proceedings; the court draws the facts only from materials presented in substantial compliance with the local rule. *Accord Metropolitan Life,* 297 F.3d at 562 ("[W]e have emphasized the importance of local rules and 'have consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment.'" (quoting *Bordelon v. Chicago Sch. Reform Bd. of Trustees,* 233 F.3d 524, 527 (7th Cir.2000))). It is important to note that "interpretation of the terms of an unambiguous contract is traditionally a question of law and is particularly suited to disposition on summary judgment." *Kallman v. Radioshack Corp.,* 315 F.3d 731, 735 (7th Cir.2002); *accord Church v. General Motors Corp.,* 74 F.3d 795, 799 (7th Cir.1996); *Highhouse v. Midwest Orthopedic Institute, P.C.,* 782 N.E.2d 1006, 1010 (Ind.Ct.App.2003) ("An unambiguous contract, *i.e.* one that does not require extrinsic evidence for interpretation, makes an appropriate subject for summary judgment." (citing *Sample v. Kinser Ins. Agency, Inc.,* 700 N.E.2d 802, 804 (Ind.Ct.App. 1998))).

## III. DISCUSSION

Before marching into the thicket of the dispute, the court finds it necessary to comment on the nature of the remedy Plaintiffs seek. They have pleaded this case as a pursuit for a judicial declaration that the present contractual relationship is "null and void and may not be enforced under the laws of this State." (Compl. at pp. 10.) Plaintiffs have fastidiously maintained this position throughout the litigation. The continued insistence upon such broad declaratory relief presents jurisdictional complications.

The declaratory judgment was a remedial species generally unknown to the common law and equity courts. *Cf. Calderon v. Ashmus,* 523 U.S. 740, 118 S.Ct. 1694, 1697–98, 140 L.Ed.2d 970 (1998) ("Before the enactment of the federal Declaratory Judgment Act, this Court expressed the view that a 'declaratory judgment' was not within that jurisdiction."). The Declaratory Judgment Act, Pub.L. No. 73–343, 48 Stat. 955–56 (1934) (codified as amended at 28 U.S.C. § 2201–02), created a new remedy available to parties in federal court. It states in pertinent part as follows: "In a case of actual controversy ... any court of the United States ... may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Declaratory judgments find procedural implementation in Fed.R.Civ.P. 57 ("The procedure for obtaining a declaratory judgment pursuant to Title 28, U.S.C., § 2201, shall be in accordance with these rules."). "Declaratory judgment actions serve an important role in our legal system insofar as they permit prompt settlement of actual controversies and establish the legal rights and obligations that will govern the parties' relationship in the future." *Hyatt Int'l Corp. v. Coco,* 302 F.3d 707, 711 (7th Cir.2002) (citing EDWIN BORCHARD, DECLARATORY JUDGMENTS 107 (1934)). As *Hyatt* illustrates (and other decisions such as *Bristol–Myers Squibb v. Ikon Office Solutions,* 295 F.3d 680 (7th Cir.2002), reinforce) contract disputes are appropriately the subject of relief prescribed by the Declaratory Judgment Act. *See generally* BORCHARD, DECLARATORY JUDGMENTS (2d ed. 1941) 499 ("The twentieth century has witnessed an extraordinary growth in the use of the declaratory judgment in commercial, and especially contractual, disputes.").

The utility of declaratory judgments encourages frequent resort to it, a consequence of which is the remedy's occasional abuse. *See Hyatt,* 302 F.3d at 711 ("[T]here is no doubt that the declaratory judgment mechanism can be abused."). Disputes seeking only a declaratory judg-

ment run the risk of falling outside the Article III "case or controversy" limitation on federal court power. Described statutorily, the Declaratory Judgment Act limits the remedy to an "actual controversy."

The record before the court clearly indicates a dispute long fomenting between the parties. New Image wants to proceed with the contractual relationship; Plaintiffs do not, and want the court to sanction their endeavor by declaring unenforceable the series of contracts between the parties. Unenforceability, however, is generally a defense to a breach-of-contract action. *See, e.g., Kilkenny v. Mitchell Hurst Jacobs & Dick,* 733 N.E.2d 984, 985 (Ind.Ct. App.2000) (asserting "several affirmative defenses, including invalidity and unenforceability of the employment contract"), *trans. denied,* 753 N.E.2d 8 (Ind.2001); *DeKalb Chiropractic Ctr., Inc. v. Bio–Testing Innovation, Inc.,* 678 N.E.2d 412, 414 (Ind.Ct.App.1997) (invoking "affirmative defense that the contract controverted public policy and was unenforceable"); *Parrish v. Toth,* 559 N.E.2d 369, 370 (Ind. Ct.App.1990) (raising contract defense of unenforceability). *Cf. Cox v. Zale Delaware, Inc.,* 239 F.3d 910, 914 (7th Cir.2001) ("If a statute declaring a type of contract unenforceable does anything, it creates a defense to a suit to enforce such a contract."). Assessing the success of a defense to a *potential* claim (breach-of-contract or otherwise) is generally the type of hypothetical question federal courts endeavor to avoid. *See* Fed.R.Civ.P. 57 advisory committee's note to adoption ("The existence or non-existence of any right, duty, power, liability, privilege, disability, or immunity or of any fact upon which such legal relations may depend, or of a status, may be declared." Noticeably absent is mention of defenses.). The "actual controversy" difficulty becomes compounded when one adds the fact (undisputed in the summary judgment record) that both parties have fulfilled their contractual

promises. *Cf. Textron Lycoming Eng. Div. v. UAW,* 523 U.S. 653, 118 S.Ct. 1626, 1630, 140 L.Ed.2d 863 (1998) ("Here, the Union neither alleges that Textron has violated the contract, nor seeks declaratory relief from its own alleged violation. Indeed, as far as the Union's complaint discloses, both parties are in absolute compliance with the terms of the collective-bargaining agreement. Section 301(a) jurisdiction does not lie over such a case.") For the unenforceability defense to come into play, Plaintiffs will need to change their behavior in such a manner as to deviate from its contractual obligations. Then, a breach-of-contract claim will have accrued in favor of New Image. With this threat of litigation looming, Plaintiffs could then poach the forum from New Image, and seek a declaratory judgment on their defense. *Cf. Hyatt,* 302 F.3d at 712 ("The declaratory judgment plaintiff must be able to show that the feared lawsuit from the other party is immediate and real, rather than merely speculative." (citing *Lake Carriers' Ass'n v. MacMullan,* 406 U.S. 498, 506–07, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972); *Norfolk Sou. Ry. Co. v. Guthrie,* 233 F.3d 532, 534–35 (7th Cir.2000))).

These complications flow from the unrestrained breadth of the remedy sought in this action. It is certainly understandable for Plaintiffs to paint their joint-Complaint with a broad brush, *see Alliant Energy Corp. v. Bie,* 277 F.3d 916, 919 (7th Cir. 2002) ("A complaint need only state the nature of the claim; details can wait for later stages."), but they did not narrow the matter for this summary judgment motion (*see* Pl. Mot. at pp. 1 ("Plaintiffs ... move the Court for partial summary judgment as to their request for a declaratory judgment that [the contracts] are null and void and may not be enforced.")). The drafting shortcomings are embellished because Plaintiffs' "action does not fit particularly well within the usual declaratory judgment

pattern, under which the 'natural' defendant wants to proceed with a business opportunity . . . but it is impeded because of a lack of clarity as to its legal rights, fearing something like a possible patent infringement suit." *Hyatt,* 302 F.3d at 711. Fitting within the "usual declaratory judgment pattern" is not a necessary condition to the existence of an "actual controversy," but its absence suggests the petition is jurisdictionally vulnerable. *Cf. Bontkowski v. Smith,* 305 F.3d 757, 761 (7th Cir.2002) (holding declaratory relief unavailable because the aim of plaintiff's petition did not conform to any of "the various purposes for which such relief can be sought").

Plaintiffs are not seeking a declaratory judgment to seize upon a business opportunity. Similarly, they want no other form of *quia timet* relief, for they have communicated no feeling of impending harm either to another person caused by them, or injury to themselves caused by New Image. Instead, the dominant inference to be drawn from the record is Plaintiffs' desire to terminate their relationship with New Image. Asking a court to declare a contracting party's right to terminate is common. *See* BORCHARD, *supra* at 558 ("[T]he plaintiff may claim a declaration of his own privilege to terminate, or that some event had terminated the contract, instead of running the risk purporting first to terminate or repudiate and thus expose himself to risk and suit."); 12 JAS. WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 57.80 ("Declaratory relief may be sought to resolve contract disputes in the following matters . . . [t]he right to terminate the contract."). *See also Bristol–Myers Squibb Co.,* 295 F.3d at 683 (7th Cir.2002) (permitting a declaratory judgment on the questions of whether "the *contract* (1) *allowed for early termination,* and (2) did not give Ikon a right of first refusal" (emphasis added)).

The text of the Declaratory Judgment Act lends further support to the court's conclusion that as presently drafted, Plaintiffs are pursuing a remedy beyond the jurisdictional horizon. The statute permits a federal court to declare only a plaintiff's rights or other legal relations. 28 U.S.C. § 2201(a). A declaration regarding the right to terminate is easily reconcilable with the statutory text; a defense to a non-existent, non-imminent breach-of-contract claim is not.

Plaintiffs' infirmity, however, appears to be more one of form, than substance. They want a clean break from New Image and this litigation can be fairly considered as such an attempt. Thus, the court will proceed to resolve whether Plaintiffs have a right to terminate their contractual arrangement with New Image. More precisely stated, the question is whether, based on the various contractual provisions to which Plaintiffs point (and other matter in the record) Plaintiffs can terminate the relationship because it calls for New Image to unlawfully engage in the practice of dentistry. (*Cf.* Pl. Mot. at ¶ 5.) Plaintiffs premise their right to terminate on five contractual provisions. The court will analyze each in the order in which they appear in Plaintiffs' joint motion.

### A.

■ Plaintiff Cohen first focuses upon section 6.1 of the Orthodontist Employment Agreement (entitled "Covenant Not to Compete"). Indiana law looks askance upon covenants to refrain from competing, for their risk of operating as a restraint of trade. *See Ackerman v. Kimball Intern., Inc.,* 652 N.E.2d 507, 509–10 (Ind.1995) (citing *Licocci v. Cardinal Assocs., Inc.,* 445 N.E.2d 556 (Ind.1983)). Cohen contends the covenant imposing a compete-free zone of five miles from the practice's present location for a two-year duration,

restrains trade, and is unenforceable against him. (*See* Pl. Brief at 10–12.) New Image counters that the non-compete terms are valid and enforceable measures, designed to protect its business interests. (*See* Def. Mem. at 34–39.)

The initial, seemingly obvious question is whether the enforceability of the covenant is presently suitable for judicial adjudication. Plaintiffs have litigated this action in pursuit of a declaratory judgment, which requires an "actual controversy," 28 U.S.C. § 2201(a), one component of which is a ripe dispute, *see Pub. Svc. Comm'n of Utah v. Wycoff Co., Inc.*, 344 U.S. 237, 243–44, 73 S.Ct. 236, 97 L.Ed. 291 (1952); BORCHARD, *supra* at 56–57 ("Where the plaintiff is merely in doubt as to his rights under a written instrument ... and ... some event must happen before the plaintiff's right fully accrues, the action is naturally considered as prematurely brought." (footnote omitted)). The right to terminate presents an "actual controversy," but this dominant premise rests on five subsidiary premises, namely that the five contractual terms Plaintiffs have identified are void. Plaintiffs contend the sum total of these deficiencies permits Plaintiffs to terminate their relationship with New Image.

Cohen argues that the non-competition clause is facially unenforceable, and perhaps therein lies the ripeness problem. Nothing in the record could lead to the conclusion that Cohen is competing with New Image (and therefore fearful of a lawsuit to enjoin the competition). Similarly, the record contains no facts suggesting competition is imminent. In fact, nothing in the record indicates any change in the legally relevant circumstances since the date the agreements were executed (but certainly Cohen could not have asked for a declaratory judgment as to the enforceability of the covenant on the day after the agreements were executed; the key intervening events in this action, the 2001 Amendments and Dr. Hamilton's illness do not impact the non-compete clause). Based on the summary judgment record, the question of the term's enforceability poses no "actual controversy."

Cohen's position fails for two more reasons unrelated to the pursuit of declaratory relief. As the court has emphasized, Cohen wants to end his relationship with New Image. Demonstrating the non-compete clause acts as a restraint upon trade, however, does not aid in this endeavor. A determination that the non-compete clause restrains trade would merely allow Cohen to set up a competing shop within five miles of the current location of Cohen Orthodontic sooner than two years *assuming the relationship has terminated.* Cohen has also sought in this action to highlight New Image's unlawful practice of dentistry. This intention receives prominence at the front of his pleading. (Compl. at ¶ 1 ("This is a case to stop the illegal corporate practice of dentistry.").) The non-compete clause, however, no matter how one construes it, does not implicate New Image in the practice of dentistry. As the parties both assert, a covenant to refrain from competing necessarily entails consideration of business interests and the markets implicated by the covenant. There is no room in this analysis for determining whether New Image has engaged in dental practice. The IDPA, the statute which defines what the practice of dentistry in Indiana entails, has nothing to say on the subject of non-compete clauses. Ironically, to succeed on the non-compete covenant aspect of this law suit, Cohen must posit that New Image does *not practice dentistry.* (*Cf.* Pl. Brief at 11 ("However, [Co]he[n] does not manage dentist offices or practices, nor does he have a business interest in doing so. Meanwhile, OrthAlliance New Image is a corporation that manages dentist offices and has a business interest in managing dentist practices.

However, OrthAlliance New Image does not practice dentistry itself.").)

■ The court must deny summary judgment on this issue for yet another reason. Even if the court could ignore the lack of an "actual controversy" and the logical difficulties with Cohen's position, neither side has presented facts on the restraint of trade issue. Under Indiana law, a court must refuse to enforce a non-compete covenant if enforcement thereof would operate as a restraint of trade. *See Ackerman,* 652 N.E.2d at 509–10. *Every* non-compete clause worth drafting restrains trade in some way, for that is the very purpose-to eliminate a strain of competition. *See* Restatement (Second) of Contracts § 186 cmt. a (1981) ("Every promise that relates to business dealings or to a professional or other gainful occupation operates as a restraint in the sense that it restricts the promisor's future activity."). Thus, a court must add some further intellectual texture to the mix. Indiana courts accomplish this by stressing the factual intensity of the inquiry. *See American Shippers Supply Co. v. Campbell,* 456 N.E.2d 1040, 1043 (Ind.Ct. App.1983) ("The determination of reasonableness is made upon the basis of the facts and circumstances of each case."); *Young v. Van Zandt,* 449 N.E.2d 300, 304 (Ind.Ct.App.1983) ("While reasonableness is a matter to be decided by the court, [citations omitted] it ultimately resides in the facts and circumstances of each individual case."); *Slisz v. Munzenreider Corp.,* 411 N.E.2d 700, 702 (Ind.Ct.App. 1980) ("[I]t is evident the authorities involving covenants not to compete frequently turn on subtle, but significant, evidentiary distinctions which must be garnered by examining the facts and circumstances

surrounding each case."). *See also* Restatement (Second), *supra* at cmt. a ("Whether a restraint is reasonable is determined in the light of the circumstances of the transaction, including not only the particular facts but the general social and economic conditions as well."). Protection of consumers is the key ethic in the consideration of whether a contractual provision is an unenforceable restraint of trade. *Cf. K.M.B. Warehouse Distributors, Inc. v. Walker Mfg. Co.,* 61 F.3d 123, 128 (2d Cir.1995) ("The overarching standard is whether defendants' actions 'diminish overall competition, and hence consumer welfare.'" (quoting *Graphic Prods. Distribs. v. Itek Corp.,* 717 F.2d 1560, 1571 (11th Cir.1983))). Thus, as the court sees this dispute, the question is whether enforcement of the non-compete clause would unreasonably alter the Allen County market for orthodontic services to the detriment of consumers and potential consumers of such services. If, as a result of Cohen's compliance with the covenant, a significant number of persons would lose reasonable access to orthodontic services (or their choice of orthodontic providers would be unreasonably reduced) the covenant would unreasonably restrain trade and the covenantor could successfully overcome an enforceability claim. Neither party, however, has tendered proof relating to the relevant market, or its demographic composition.[7] Thus, the court could not grant summary judgment even ignoring the other shortcomings.

### B.

■ Cohen provided Dr. Hamilton an option to purchase all of Cohen's interest in Cohen Orthodontic. (*See* Option Agreement II at § 1.) Since the option was

---

**7.** On account of the abrupt mid-litigation transfer of this action away from the Fort Wayne Division, judicial notice of demographic facts, Fed.R.Evid. 201(b)(1) ("A judi-

cially noticed fact must be one ... generally known within the territorial jurisdiction of the trial court."), is not possible.

granted, Dr. Hamilton fell ill, and although he holds a current, valid dental license for Indiana, he presently maintains no active practice. (*See* Stip. Concerning Dr. Hamilton at ¶ 3 ("Since May 18, 2000, Dr. Hamilton has been unable to engage in the practice of dentistry as a result of a brain tumor.").) This unfortunate event prompted Cohen to argue that even though Cohen himself granted Dr. Hamilton the option, the contract through which Cohen provided Dr. Hamilton with this right is "illegal and against public policy" apparently because Option Agreement II does not contain a clause vitiating the option if the Optionee no longer qualifies as a member of the profession to which the professional corporation is affiliated. (*See id.* ("Since the Option Agreements permit Cohen P.C. to issue options to purchase its shares to individuals who are not authorized to render dental services under the law of Indiana or another state, the Option Agreements are illegal and against public policy." (footnote omitted)).)

This claim is equally unripe. Conditions precedent are useful tools in contract drafting; they also provide courts with natural, built-in ripeness mechanisms. If a party seeks a judicial declaration with respect to a contract term not yet in effect because the condition(s) precedent has/have not yet occurred, the party must offer something (facts, argument, etc.) to convince the court to act sooner rather than later. *See generally* OLIVER WENDELL HOLMES, THE COMMON LAW 248 (Mark DeWolfe Howe ed., Belknap Press 1963) (1881) ("But all *conditions are precedent* not only in this extreme sense, but also *to the existence of the plaintiff's cause of action.*" (emphasis added)); BORCHARD, *supra* at 58–60 (explaining unripe disputes).

Option Agreement II grants Dr. Hamilton a call option exercisable for ninety days "following the occurrence of a Triggering Event." (§ 1.) The Triggering Events are (1) Cohen's receipt of a legitimate offer to buy his stock, (2) Cohen's death, and (3) termination of Cohen's employment with Cohen Orthodontic. (*Id.* at § 2.) The "Triggering Events" are express conditions precedent to the exercisability of Dr. Hamilton's call option, and the record contains no indication that any Triggering Event has occurred. In addition, even if the summary judgment record was vulnerable to an interpretation that a Triggering Event has transpired, the parties agree that Dr. Hamilton's infirmity makes non-existent the probability that he would exercise the option. (*See* Stip. Concerning Dr. Hamilton at ¶ 5 ("Dr. Hamilton ... continues to suffer from the effects of the brain tumor. Dr. Hamilton does not currently engage in the active practice of dentistry. The prognosis of his medical condition is unknown. His condition has not improved in the last two years.").)

This issue fails to rise to an "actual controversy" for an additional reason. Cohen wants to vitiate the contract, a result which would wipe-out Dr. Hamilton's option, a contract right for which he apparently tendered "good and valuable consideration." (Option Agreement II at preamble.) Cohen, however, has not named Dr. Hamilton as a party to this action. *See* Fed.R.Civ.P. 19 (joinder rules). *See also Beard v. Lofton*, 102 Ind. 408, 2 N.E. 129, 130 (1885) (explaining "there was a defect of parties defendant, in that the other persons who signed the contract with him, naming them, had not, but should have been, joined as parties defendant.").

Moreover, Cohen's claim based on Option Agreement suffers from many of the same conceptual problems discussed in Part III.A, *supra.* There is a lack of congruity between Cohen's argument based on Option Agreement II (that Cohen himself acted improperly by providing Dr.

Hamilton an option without ensuring that the Optionee must be a licensed and actively practicing dentist at all times during the pendency of the option), and Cohen's attempt in this litigation to end New Image's illegal practice of dentistry. Striking down Option Agreement II would do nothing to end New Image's purportedly illegal dental practice.

## C.

▇ Plaintiff Cohen Orthodontic next turns to the MSA, contending the 2001 Amendments to the IDPA now place three of New Image's contractual obligations perilously within the newly expanded definition of the practice of dentistry.

In section 3.2(e), the M.S.A. § empowers New Image to hire and fire "staff personnel" "provided that no staff personnel shall be hired or fired without the prior consent of [Cohen Orthodontic], which consent shall not be withheld unreasonably." According to Cohen Orthodontic, this contractual obligation falls within the 2001 Amendment limiting "[f]inal decisions relating to the employment of dental personnel," IDPA § 23(a)(13)(F), to licensed dentists. Indiana law governs the court's task to construe the contours of the contractual duty. (*See* M.S.A. § § 13.6 ("The validity, interpretation and performance of this Agreement shall be governed by and construed in accordance with the laws of the State of Indiana.").) The court must interpret the parties' agreement by giving the words their ordinary meaning. *See Design Industries, Inc. v. Cassano*, 776 N.E.2d 398, 401 (Ind.Ct.App.2002) ("The goal in contract construction is to ascertain and give effect to the mutual intent of the parties. *Cox v. Town of Rome City*, 764 N.E.2d 242, 246 (Ind.Ct.App.2002). The language employed by the parties determines their intent at the time the contract was written. *Id.* 'The words in the contract are to be given their common and ordinary meaning.' *Id.*"). The court must

also remain mindful of their business relationship. *See Gerow v. Rohm & Haas*, 308 F.3d 721, 725 (7th Cir.2002) ("And it is a fundamental principle of contract interpretation that courts read language to make business sense whenever possible." (citing *Beanstalk Group, Inc. v. AM General Corp.*, 283 F.3d 856 (7th Cir.2002))); *Hartford Fire Insurance Company v. St. Paul Surplus Lines Ins. Co.*, 280 F.3d 744, 747 (7th Cir.2002) ("Interpreting contracts to make economic sense is a method of contract interpretation that we have commended in other cases."). *See also FutureSource LLC v. Reuters Ltd.*, 312 F.3d 281 (7th Cir.2002).

Reflection upon the nature of the parties' relationship readily indicates that New Image is generally responsible for the business aspects of the Cohen Orthodontic practice. It thus makes sense for New Image to serve some role in human resource management ("HRM"). *See* David E. Guest, *Human Resources Management-the Workers' Verdict*, HUMAN RESOURCE MGMT J., Vol. 9:3, pp. 5, *available at* 1999 WL 13563861 ("[W]ithin its paradigm, any judgments of the effectiveness of HRM would be based on business performance criteria."). Notifying prospective employees of an employment offer, or telling a current employee the practice will no longer require that person's services, is frequently an obligation of an "office manager" or "human resources administrator." Juxtapose the *notification* of hiring/firing, a presumably ministerial business function, with the actual employment decision, a strategic decision, which, in the context of organizations providing professional services, frequently rests with a "hiring partner," executive officer, or key employee. *See* Kim Hoque & Mike Noon, *Counting Angels: A Comparison of Personnel and HR Specialists*, HUMAN RESOURCE MGMT J., Vol. 11:3, pp. 5 (2001), *available at* 2001 WL 16337057 (parsing the difference be-

tween "personnel specialists" and "HR specialists" in, among other things, "strategic decision making"); Patrick McGovern, *et al.*, *Human Resource Management on the Line?*, HUMAN RESOURCE MGMT J., Vol. 7:4, pp. 12 (1997), *available at* 1997 WL 23794207 (normative and prescriptive organizational relationships between line and personnel management). *See also* Claudio Fernandez–Araoz, *Hiring without Firing*, HARV. BUS. REV., Aug. 1999, at 108, *available at* 1999 WL 100834043.

The unambiguous language of section 3.2(e) indicates New Image must give prospective employees and soon-to-be-terminated employees notification of the impending event and presumably marshal the requisite paperwork. The unambiguous language also states that before New Image informs the person of their hiring or firing, Cohen Orthodontic would have already been provided the opportunity to consent. As the contractual text indicates, the only limitation on this power is that "consent shall not be withheld unreasonably." In the usual case, one would envision the "final employment decision" resting with Cohen Orthodontic because either (1) Cohen Orthodontic consents, or (2) Cohen Orthodontic withheld consent reasonably. (Perhaps, the relationship works in such a way that Cohen Orthodontic expresses to New Image a desire to hire/fire a certain dental office person, and New Image effectuates the command. Such a procedure would seemingly conform to the section 3.2(e) prescription.) A third possibility could occur if Cohen Orthodontic withheld consent, and believing Cohen Orthodontic withheld consent *un*reasonably, New Image charges forward with the proposed hiring/firing decision. When the parties disagree on the reasonableness of the consent, what happens? The contractual text offers no definitive answer; the summary judgment record contains no meaningful parol evidence on the subject; and since Cohen Orthodontic has litigated

this action as a *facial challenge* to the MSA, the court does not have before it an actual experience where New Image brought a dental office person on board (or threw the person overboard) even though Cohen Orthodontic refused to consent to the hiring/firing decision. The business circumstances surrounding the relationship and other provisions within the M.S.A. § indicate the consent requirement should be read so that the dentist retains final decisionmaking hiring/firing power over dental office personnel.

The business texts the court has cited indicate a preference toward placing the ministerial aspects of hiring/firing in HRM. It is also clear that the executive or "hiring partner" is the person in whom the hiring/firing power customarily rests. From the business circumstances of the relationship between Cohen Orthodontic and New Image, it is clear the parties intended a similar division of responsibilities. Cohen Orthodontic outsources certain management function, including HRM, to New Image. In the present context, this would mean the provision of ministerial support for the hiring/firing decisions of dental office personnel, over which Cohen Orthodontic retains the ultimate power. The business nature of the relationship, therefore, would dictate an interpretation that resolves the dispute over section 3.2(e) in such a way as to preserve final decisionmaking authority for dental office personnel in the hands of the dentist, a result similarly prescribed by IDPA § 23(a)(13)(F).

■ The contractual text also indicates the parties would resolve the dispute over section 3.2(e) by preserving the orthodontist's power to make hiring/firing decisions for dental office personnel. Cohen Orthodontic and New Image contemplated the possibility that at some point during the forty-year duration of the MSA, one or

more of New Image's obligations could be construed as the practice of dentistry. The parties dealt with this shared concern in (at least) three different places in the MSA. Two of the provisions are manifestations of the parties' intention to preserve the fundamental integrity of the accord by treating the contractual term calling for New Image to practice dentistry as waived by Cohen Orthodontic (section 13.6 [8]) or severed (section 13.7 [9]). Severability is the preferred form of remedy under Indiana contract law where, as here, less than all the obligations implicate illegality. *See Harbour v. Arelco, Inc.,* 678 N.E.2d 381, 385 (Ind.1997) ("[I]f a contract contains an illegal provision which can be eliminated without frustrating the basic purpose of the contract, the court will enforce the remainder of the contract." (citing *Corner v. Mills,* 650 N.E.2d 712, 715 (Ind.Ct.App.1995))). The final decisionmaking function is a small portion of the array of business services at work in this contractual relationship. Severing New Image's putative right to final hiring/firing decisions for dental office personnel would not undermine the fundamental nature of the relationship. Moreover, New Image's

memorandum (pp. 29–30) points to another provision strongly suggesting that if Cohen Orthodontic persists in its belief that New Image wrongfully maintains final decisionmaking power over dental office personnel, the parties must amend the M.S.A. § in such a way as to eliminate that authority. (*See id.* at § 13.11.[10]) This makes sense. New Image has no desire to practice dentistry; it is a practice management outfit. Cohen Orthodontic is the dentist who hired New Image to perform practice management functions. In the MSA, the parties memorialized their intent to preserve this fundamental division of responsibilities, and the parties intended that if a previously promised act became proscribed, the promisor would not be responsible for performance and the promisee could not expect performance or pursue a breach-of-contract claim thereon. (*See id.* ("To the maximum extent possible, any such amendment *shall preserve the underlying economic and financial arrangements* between [Cohen Orthodontic] and [New Image]." (emphasis added)).)

The plethora of contractual language and surrounding business context favoring

---

**8.** Section 13.6 provides in pertinent part as follows:

> The parties acknowledge that [New Image] is not authorized or qualified to engage in any activity which may be construed or deemed to constitute the practice of dentistry or orthodontics. To the extent any act or service required of [New Image] in this Agreement should be construed or deemed, by a governmental authority, agency or court to constitute the practice of dentistry or orthodontics, the performance of said act or service by [New Image] shall be deemed waived by [Cohen Orthodontic] and forever unenforceable; provided, however, in no event shall the unenforceability of an act or service caused by this Section affect the enforceability of any other provisions of this Agreement.

**9.** Section 13.7 provides in its entirety as follows:

> The provisions of this Agreement shall be deemed severable and if any portion shall be held invalid, illegal or unenforceable for any reason, the remainder of this Agreement shall be effective and binding upon the parties.

**10.** Section 13.11 provides in pertinent part as follows:

> If any state or federal laws or regulations, now existing or enacted or promulgated after the effective date of this Agreement, are *interpreted by* judicial decision, a regulatory agency or *legal counsel* in such a manner as to indicate that the structure of this Agreement may be in violation of such laws or regulations, [Cohen Orthodontic] and [New Image] *shall amend this Agreement as necessary.* (emphasis added)

a construction faithful to New Image's position also dovetails with Plaintiffs' overarching legal thesis. Plaintiffs, remember, brought this action "to stop the illegal corporate practice of dentistry." (Compl. at ¶ 1.) The parties, in M.S.A. § section 13.6, agreed to impose a waiver upon the right to receive contractual performance flowing from any act or service ever determined by a governmental authority, agency, or court to constitute the practice of dentistry. *See supra* note 8. Moreover, the parties can amend the M.S.A. § to conform to a mutual understanding that New Image is not responsible for performing any act that would expose it to the practice of dentistry. Alternatively, Cohen Orthodontic could acquiesce to the severance of the term(s) at the source of its concern for New Image's future actions, a remedial measure also endorsed by Indiana contract law, *see Harbour*, 678 N.E.2d at 385. These measures assuage Plaintiffs' valid professional, ethical concerns.

This analysis finds equal applicability to the other two terms for which Cohen Orthodontic seeks a basis for terminating the relationship. Contrary to Cohen Orthodontic's contention, section 3.2(f) (entitled "Orthodontic Services") does not vest control over clinical judgment in New Image's hands as a matter of law. The provision does not mention New Image, and even concludes "that the ultimate decision as to the type of orthodontic services to be rendered to patients shall be made by [Cohen Orthodontic] in consultation with its patients." As for section 6.6, it allocates the ordering and purchase of supplies to Cohen Orthodontic and New Image, respectively. The unambiguous language of section 6.6 does not, as Cohen Orthodontic contends, permit New Image to control the use of dental materials "*while* the equipment or material *is being used* to provide dental services," IDPA § 23(a)(11) (emphasis added).

## IV. CONCLUSION

Plaintiffs seek a judicial declaration that they have the right to terminate their contractual relationship with New Image, based on the dubious future enforceability of five contractual provisions. Plaintiffs litigated this action solely by reference to the face of the written instrument and not to any contractual experience. Two provisions to which they point are not ripe for consideration. Of the remaining three, the unambiguous language of M.S.A. § sections 3.2(f) and 6.6 do not place New Image in the precariousness of dental practice imposed by the 2001 Amendments. The business context of the relationship favors a construction of section 3.2(e) that preserves the orthodontist's power to make final decision regarding the hiring/firing decisions for dental office personnel, with New Image providing HRM support. The waiver, severance, and amendment measures drafted into the M.S.A. § bolster the conclusion that the parties intended to preserve the underlying relationship. Indiana contract law favors severance of the dubious terms in this situation. The right to terminate, predicated on the five contractual provisions at issue in this litigation, is not available.

New Image's summary judgment motion is **GRANTED IN PART** and **DENIED IN PART**. The court **DENIES** Plaintiffs' joint summary judgment motion. The motion to strike is **DENIED AS MOOT**. After reviewing the Complaint, the court concludes this Order resolves all pleaded claims. Thus, a final judgment, Fed. R.Civ.P. 58, appears appropriate. If Plaintiffs believe triable issues remain, they must submit (no later than thirty days from the date of this Order) a memorandum stating the triable issues with supporting argument. Upon consideration of Plaintiffs' filing, the court will take the

steps necessary to further the just resolution of this action.

**SO ORDERED.**