Paul L. LITMER, Plaintiff,

v.

PDQUSA.COM, Defendant.

No. 1:04–CV–105.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

July 27, 2004.

David A. Lundy, Krieg DeVault Lundy LLP, Fort Wayne, IN, Alastair J. Warr, Krieg DeVault LLP, Indianapolis, IN, for Plaintiff.

D. Randall Brown, Gary C. Furst, Barnes & Thornburg–FW/IN, Fort Wayne, IN, Sibley P. Reppert PHV, Lahive & Cockfield LLP, Boston, MA, for Defendant.

## MEMORANDUM OF DECISION AND ORDER

COSBEY, United States Magistrate Judge.

## I. INTRODUCTION

Plaintiff Paul L. Litmer's ("Litmer") complaint alleges that the manufacture and sale of a product called "Mirror Mitts" by Defendant PDQUSA.com ("PDQ") infringes on a patent held by Litmer, in

violation of 35 U.S.C. § 271.[1] Before the Court is PDQ's motion to dismiss for lack of personal jurisdiction. After considering the motion and the relevant law, the Court finds that the motion should be DENIED.

## II. FACTS

Litmer owns United States Patent No. 6,286,964, for a product named "Mirror Cover." (Compl.¶ 8.) He developed and designed the product at his home in Woodburn, Indiana, and it is currently manufactured and sold by a company in Union City, Indiana. (Pl.'s Resp. to Def.'s Mot. to Dismiss at 2.) PDQ is a Massachusetts corporation doing business in Worcester, Massachusetts. (Compl.¶ 2.) PDQ operates a website, *http://www.mirrormitts.com*, where it advertises the allegedly infringing product, Mirror Mitts.[2] (Compl.¶ 3.)

PDQ's website, which is dedicated solely to Mirror Mitts and one other product ("Knee Pads"), has a tab near the top of the homepage labeled "Order." (*See* Pl.'s Resp., Ex. 1.) Clicking on this tab leads to a page prompting the viewer to enter a desired quantity of Mirror Mitts and/or Knee Pads; the page also displays a total price that corresponds to the quantity of products entered. (Aff. of Matthew C. Branic ¶ 9 and Ex. B.) The viewer is further prompted to select a shipping method and enter any "special instructions." (*Id.* ¶ 10 and Ex. B.) At the bottom of the page is a button labeled "Continue" and the following text:

> Within 48 hours after order is received, Sales tax, if applicable, along with shipping and handling charges, will be calculated and a Company Representative will contact you Regarding Credit Card Information.
>
> * Please have the following information ready:
>
> Name and address of card holder
>
> Credit card number
>
> Expiration date
>
> Thank you for your order

(*Id.*)

Upon pressing "Continue," the viewer is taken to another page requesting further information. (*Id.*, Ex. C.) Here, the viewer is to enter his name, position, and other personal contact information, along with a complete shipping address and billing address. (*Id.*) When entering a state for the shipping and billing addresses, the viewer must choose from a drop-down menu of states; this menu includes every state except Indiana. (*Id.*) At the bottom of this page is another button marked "Continue" and the warning that "Mirror Mitts are NOT available in the State of Indiana." (*Id.*) Clicking "Continue" leads the viewer to a final page reading "Thank You for Your Order." (Aff. of Clifford A. Holleran ¶ 13.) According to PDQ, the website then "generates an informational e-mail to PDQ," after which PDQ calls the customer to obtain credit card information and complete the sale. (Reply at 1.)

## III. STANDARD OF REVIEW

█ Where, as here, the parties agree that personal jurisdiction can be determined based on affidavits and other written materials in the absence of an eviden-

---

1. This Court therefore retains subject matter jurisdiction under 28 U.S.C. § 1331. Jurisdiction of the undersigned Magistrate Judge is based on 28 U.S.C. § 636(c), all parties consenting.

2. Mirror Mitts are yellow foam sleeves that slip over a tractor-trailer's front mirrors when the vehicle is brought in for service. PDQ's website touts Mirror Mitts as "a safe way of protecting technician's [sic] working on and walking around the trucks as they are being serviced." *See http://www.mirrormitts.com*.

tiary hearing, the plaintiff need only make a *prima facie* showing that the defendant is subject to personal jurisdiction. *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir.2003). Since personal jurisdiction is raised via a motion to dismiss, *see* Fed.R.Civ.P. 12(b)(2), the Court must accept the uncontroverted allegations in the complaint as true and resolve any factual conflicts in the affidavits in the plaintiff's favor, *Purdue Research Found.*, 338 F.3d at 782; *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir.2002).

## IV. DISCUSSION

■■■ Determination of personal jurisdiction normally requires a two-step inquiry, to ascertain (1) whether the defendant falls within Indiana's long-arm statute; and (2) whether the exercise of jurisdiction over the defendant comports with the requirements of federal due process. *E.g., Purdue Research Found.*, 338 F.3d at 779. However, Indiana's long-arm statute has recently "been expanded to the full extent of the law," *Richards & O'Neil, LLP v. Conk*, 774 N.E.2d 540, 550 n. 6 (Ind.App. 2002) (Najam, J., concurring), as it provides that "a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States," Ind. Trial R. 4.4(A). Accordingly, the first prong of the inquiry

collapses into the second prong, and the only issue is whether the exercise of jurisdiction over PDQ comports with federal due process. *See Dainippon Screen Mfg. Co. v. CFMT, Inc.*, 142 F.3d 1266, 1270 (Fed.Cir.1998) ("because California's long-arm statute is coextensive with the limits of due process ... the two inquiries collapse into a single inquiry: whether jurisdiction comports with due process" (internal citation omitted)).[3] As in all patent infringement cases, the due process inquiry here is controlled by the law of the Federal Circuit. *E.g., 3D Sys., Inc. v. Aarotech Lab., Inc.*, 160 F.3d 1373, 1377 (Fed.Cir.1998).

■■■ Due process requires that the defendant have "certain minimum contacts with [the forum state] such that the maintenance of the suit does not offend traditional notions of fair play and justice," *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (internal quote marks omitted), and that these contacts be "purposeful," *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). The requirement of purposeful minimum contacts "helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum." *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1565 (Fed.Cir.1994).

**3.** Prior to January 1, 2003, Indiana's long-arm statute was *not* coextensive with the limits of due process, but rather was an "enumerated act" statute, which "direct[ed] the court to assert jurisdiction over defendants who commit any act listed in the statute in the state." *Anthem Ins. Co. v. Tenet Healthcare Corp.*, 730 N.E.2d 1227, 1231–32 (Ind. 2000). Interpreting this previous iteration of the statute, the Indiana Supreme Court held that courts must engage in both steps of the two-step inquiry, "first determining whether the conduct falls under the long-arm statute and then whether it comports with [due process]." *Id.* However, effective January 1, 2003, the long-arm statute was amended to include the language that "a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States." Ind. Trial R. 4.4(A). Although no Indiana court has definitively interpreted this language to date, its addition clearly makes the statute coextensive with the limits of due process, *see Richards*, 774 N.E.2d at 550 n. 6 (Najam, J., concurring), abrogating *Anthem* and allowing courts to collapse the two-prong analysis into a single inquiry: whether the exercise of jurisdiction comports with due process.

■ Purposeful minimum contacts can create "general" or "specific" jurisdiction. *See Red Wing Shoe Co. v. Hockerson–Halberstadt, Inc.,* 148 F.3d 1355, 1359 (Fed.Cir.1998). General jurisdiction may be imposed on a defendant who has "continuous and systematic" contacts with the forum, even if those contacts have no relation to the cause of action, *id.,* but Litmer does not claim that PDQ has such contacts. Rather, Litmer alleges specific jurisdiction, where "even a single act can support jurisdiction, so long as it creates a substantial connection with the forum." *Id.* (internal quote marks omitted).

■ The Federal Circuit has adopted a three-prong test for determining whether the exercise of specific personal jurisdiction comports with due process, which looks to whether (1) the defendant purposefully directed its activities at residents of the forum state; (2) the claim arises out of or relates to the defendant's activities with the forum state; and (3) assertion of personal jurisdiction is reasonable and fair. *Elec. For Imaging, Inc. v. Coyle,* 340 F.3d 1344, 1350 (Fed.Cir.2003), *cert. denied,* —— U.S. ——, 124 S.Ct. 1085, 157 L.Ed.2d 899 (2004). While the plaintiff bears the burden on the first two elements, upon such a showing, the defendant must prove that the exercise of jurisdiction is unreasonable. *Id.*

### A. PDQ Purposefully Directed Its Activities At Residents of Indiana

As the Northern District of Illinois aptly observed,

The concept of personal jurisdiction by virtue of a party's Internet activities is in a state of development. A website on the Internet is accessible the world over. Simply registering a domain name for a website is not sufficient to create jurisdiction without "something else".... This "something else" is precisely what the courts have been grappling with. Thus, the analysis must begin with what else is needed, that is, what level of interaction with an Internet website is required to rise to the level of "minimum contacts" such that a defendant maintaining that website has purposefully availed itself of the laws of the forum state, making specific personal jurisdiction over it appropriate.

*Euromarket Designs, Inc. v. Crate & Barrel Ltd.,* 96 F.Supp.2d 824, 837 (N.D.Ill. 2000) (internal citations omitted). Unfortunately, the Federal Circuit has not yet definitively ruled on the issue; the parties proffer no published Federal Circuit cases addressing the exercise of specific personal jurisdiction based on a website, nor does the Court's research reveal any.[4] However, "other circuits and several district courts have spoken on the issue[,] .... leading to the emergence of a three part sliding scale analysis" to determine when the maintenance of a website creates the purposeful minimum contacts required by due process. *Id.*

■ The three-part sliding scale originated in *Zippo Mfg. Co. v. Zippo Dot Com, Inc.,* 952 F.Supp. 1119 (W.D.Pa.

---

4. Although PDQ urges the Court to consider *Hockerson–Halberstadt, Inc. v. Propet USA, Inc.,* 62 Fed.Appx. 322, 2003 WL 1795641 (Fed.Cir.2003) and *Maynard v. Philadelphia Cervical Collar Co.,* 18 Fed.Appx. 814, 2001 WL 929708 (Fed.Cir.2001), two cases which discuss personal jurisdiction based on a website, the Court must decline, as these cases are unpublished and thus not citable as precedent under Fed. Cir. R. 47.6. Even if the Court were to consider them, they do not help PDQ's cause, as *Hockerson–Halberstadt* deals only with general jurisdiction, 62 Fed.Appx. at 336–38, 2003 WL 1795641 at *12–13, and *Maynard* involves only a "general access web page" which is clearly not comparable to PDQ's, 18 Fed.Appx. at 815–16, 2001 WL 929708 at *1.

1997). The *Zippo* court, while recognizing that "the permissible scope of personal jurisdiction based on Internet use is in its infant stages," found that "review of the available cases and materials reveals that the likelihood that personal jurisdiction can be exercised is directly proportionate to the nature and quality of commercial activity that an entity conducts over the Internet." *Id.* at 1123–24. At one end of the scale are defendants who clearly do business (i.e., enter into contracts) with residents of the forum over the Internet and thus should be subject to personal jurisdiction. *Id.* at 1124 (citing *CompuServe, Inc. v. Patterson,* 89 F.3d 1257 (6th Cir.1996)). At the other end are defendants with "passive" websites, who merely "make information available to those who are interested" and thus should not be subject to personal jurisdiction. *Id.* (citing *Bensusan Rest. Corp. v. King,* 937 F.Supp. 295 (S.D.N.Y.1996), *aff'd,* 126 F.3d 25 (2nd Cir.1997)). In the middle are defendants with "interactive" websites, where a user can exchange information with the host computer but cannot enter contracts; here, "the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the [website]." *Id.* (citing *Maritz, Inc. v. Cybergold, Inc.,* 947 F.Supp. 1328 (E.D.Mo.1996)). This three-part sliding scale has emerged as the majority rule, *e.g., Toys "R" Us, Inc. v. Step Two, S.A.,* 318 F.3d 446, 452 (3rd Cir.2003); *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 713 (4th Cir.2002), *cert. denied,* 537 U.S. 1105, 123 S.Ct. 868, 154 L.Ed.2d 773 (2003); *Gator.com Corp. v. L.L. Bean, Inc.,* 341 F.3d 1072, 1079 (9th Cir.2003), *reh'g en banc granted,* 366 F.3d 789 (9th Cir. Apr.29, 2004); *Mink v. AAAA Dev., LLC,* 190 F.3d 333, 336 (5th Cir.1999); *Soma Med. Int'l v. Standard Chartered Bank,* 196 F.3d 1292, 1296 (10th Cir.1999); *Euromarket,* 96 F.Supp.2d at 837, and thus the Court will apply it here.

 PDQ opens with the rather astonishing claim that its website is "passive" and "purely informational." (Mem. in Supp. of Mot. to Dismiss at 2, 8.) This contention is belied by even a cursory examination of the website, which encourages the user to "order" Mirror Mitts by transmitting detailed information to PDQ through the website, including the quantity of Mirror Mitts desired, preferred method of shipping, shipping address, and billing address. Contrary to PDQ's argument, this is certainly not a website which merely "make[s] information available to those who are interested." *Zippo,* 952 F.Supp. at 1124. Rather, it allows the user to exchange information with PDQ, which puts it into the category of "interactive" websites and requires the Court to examine "the level of interactivity and commercial nature of the exchange of information that occurs on the [website]." [5] *Id.*

Analogous cases examining "interactive" websites show that PDQ's website is sufficient to create purposeful minimum contacts. For instance, *Publications Int'l, Ltd. v. Burke/Triolo, Inc.,* 121 F.Supp.2d 1178, 1182–83 (N.D.Ill.2000), dealt with a website which allowed users to request a catalog containing the allegedly infringing product and to "register . . . [for a] mailing

---

**5.** PDQ repeatedly stresses that its website does not accept credit card information and thus that PDQ does not complete sales on the website. However, this only goes to show that PDQ's website does not fall into *Zippo's* first category of websites (those where contracts are created), for which the exercise of jurisdiction is presumptively proper. 952 F.Supp. at 1154. It does not .change the obvious conclusion that PDQ's website is "interactive" and thus can support jurisdiction depending on "the level of interactivity and commercial nature of the exchange of information that occurs on the [website]." *Id.*

list to receive special offers." The court described this as "both interactive and commercial in nature," making the exercise of jurisdiction proper. *Id.* at 1183. Here, PDQ goes even farther: its website allows users to request *the product at issue*, not just a catalog containing it or inclusion on a mailing list. Even more so than the defendant in *Publications*, PDQ "solicits users from other jurisdictions to engage in a business relationship," *id.*, creating the contacts necessary for personal jurisdiction.

Similarly, in *Maritz* (cited as a paradigm "interactive website" case by *Zippo* ), the defendant's website invited users to sign up for a mailing list and thereby receive advertisements for the defendant's services. 947 F.Supp. at 1333. The court characterized the contacts created by the website as "of such a quality and nature . . . that they favor the exercise of personal jurisdiction." *Id.* Again, PDQ's website goes much farther, as it allows users in other forums to "order" its products, not just join a mailing list.

In short, PDQ's website features a very high "level of interactivity" and the "exchange of information" is clearly "commercial" in "nature." [6] *Zippo*, 952 F.Supp. at 1124. Users of the website can provide PDQ with every piece of information necessary to complete a sale except a credit card number, and the website itself char-

acterizes this process as placing an "order" for Mirror Mitts. *Cf. 3D Systems*, 160 F.3d at 1378 (holding that defendant purposefully directed its activities at the forum state by "solicit[ing] orders," although not in the Internet context). Accordingly, Litmer has met his burden of showing that the commercial activities on PDQ's website are purposefully directed at other forums, including Indiana.[7]

### B. Litmer's Claim Arises Out Of PDQ's Activities In Indiana

The second prong of the due process inquiry is whether the plaintiff's claim arises out of or relates to the defendant's activities with the forum state. *Elec. For Imaging*, 340 F.3d at 1350. Patent infringement, Litmer's sole claim here, occurs when someone "without authority makes, uses, *offers to sell* or sells any patented invention." 35 U.S.C. § 271(a) (emphasis added). Litmer contends that PDQ offered to sell Mirror Mitts via its website, and thus that his patent infringement claim arises out of PDQ's Indiana activities.

The Federal Circuit considered a similar argument in *3D Systems*. There, one of the defendants sent letters to residents of the forum that, *inter alia*, contained price quotations and "solicited orders." 160 F.3d at 1376. Although these letters "state[d] on their face that they are purportedly not offers," the Federal Circuit nonetheless

---

**6.** PDQ's attempts to analogize this case to *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414 (9th Cir.1997), are therefore unpersuasive. The court in *Cybersell* declined to exercise jurisdiction, as the defendant maintained an "essentially passive" website that merely "allow[ed] the browser to introduce himself." *Id.* at 415–16, 419. This is not comparable to PDQ's website, which solicits and accepts "orders" for Mirror Mitts that include quantities, shipping instructions, and shipping and billing addresses.

**7.** PDQ's website does not allow users to select Indiana as the state for their shipping or billing address, and it warns users that "Mirror Mitts are NOT available in the State of Indiana." However, Litmer alleged both in his brief and at oral argument that this Indiana exclusion appeared only after the complaint was filed in this case, and that it is merely an attempt to retroactively divest this Court of jurisdiction. PDQ has never denied this allegation, and it does not claim that the Indiana exclusion has any bearing on the issue of jurisdiction. Accordingly, the Court attaches no significance to the exclusion.

held that they were, because "to treat them as anything other than offers to sell would be to exalt form over substance." *Id.* at 1379. The court opined that since the letters were intended to "generat[e] interest in a potential infringing product to the commercial detriment of the rightful patentee," they were offers to sell under § 271, and thus the plaintiff's claim for patent infringement arose out of the defendant's activities in the forum. *Id.*

The instant case is indistinguishable from *3D Systems*. PDQ's website, like the letters in *3D Systems*, provides price quotations, as the first "order" form displays price totals corresponding to how many products the user requests. Moreover, the website not only *solicits* orders, as did the letters in *3D Systems*, it *accepts* orders from its users. Clearly, PDQ's website is intended to "generate interest in a potential infringing product to the commercial detriment of the rightful patentee," and thus it constitutes an "offer to sell" under § 271. *Id.* Accordingly, Litmer's claim for patent infringement arises out of PDQ's contacts with Indiana, satisfying the second prong of the due process inquiry. *Elec. For Imaging*, 340 F.3d at 1350.

### C. Assertion of Jurisdiction Over PDQ Is Reasonable and Fair

■ Since Litmer has satisfied the first two prongs of the due process analysis, the burden now shifts to PDQ to "present a compelling case that the presence of some other considerations [renders] jurisdiction unreasonable." *Id.* at 1351–52 (internal quote marks omitted). Factors to consider in this analysis include (1) the burden on the defendant; (2) the interests of the forum state; (3) the plaintiff's interest in obtaining relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 1352.

■ PDQ's briefs contain no argument that jurisdiction is unreasonable or unfair in this case; all of its written arguments concern the first two prongs of the due process analysis. Similarly, at oral argument, PDQ's counsel did not seriously address the third prong of the analysis, other than to briefly assert that PDQ is a "small, struggling" business which should not be subjected to the "tremendous burden" of defending itself in Indiana. While the Court is somewhat sympathetic to this concern, it should be noted that "progress in communications and transportation has made the defense of a lawsuit in a foreign tribunal less burdensome." *World Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 294, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (quoting *Hanson v. Denckla,* 357 U.S. 235, 250–51, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958)); *see also Bd. of Tr., Sheet Metal Workers Nat'l Pension Fund v. Elite Erectors, Inc.,* 212 F.3d 1031, 1037 (7th Cir.2000) ("Easy air transportation, the rapid transmission of documents, and the abundance of law firms with nationwide practices, make it easy these days for cases to be litigated with little extra burden in any of the major metropolitan areas").

Moreover, any burden on PDQ is outweighed by the other factors to be considered. *See Elec. For Imaging,* 340 F.3d at 1352. The forum state, Indiana, clearly has an "interest in ensuring that entities conducting business within its borders do not violate federal patent laws." *Int'l Truck and Engine Co. v. Dawson Int'l Inc.,* 216 F.Supp.2d 754, 762 (N.D.Ind. 2002). Moreover, Litmer's interest in obtaining relief is manifest, as he alleges that PDQ's website offers a product infringing

Litmer's patent to Indiana consumers.[8]

In short, PDQ's cursory argument that it should not be subjected to the burden of litigating in Indiana falls far short of demonstrating that this is "one of those rare cases," *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal., Solano County,* 480 U.S. 102, 116, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987) (Brennan, J., concurring in part and concurring in the judgment), where the exercise of personal jurisdiction is unreasonable or unfair despite the existence of purposeful minimum contacts.

## V. CONCLUSION

As explained *supra,* (1) PDQ purposefully directed its activities at Indiana through its operation of a highly interactive and commercial website; (2) Litmer's patent infringement claim arises out of PDQ's activities in Indiana, because PDQ's website "offers to sell" Mirror Mitts to Indiana residents; and (3) PDQ fails to show that the exercise of personal jurisdiction is unreasonable or unfair. Accordingly, Litmer has made the required *prima facie* showing that PDQ is subject to personal jurisdiction, *Purdue Research Found.,* 338 F.3d at 782, and thus PDQ's motion to dismiss is DENIED.

This matter is now reset for a Rule 16 scheduling conference (*see* Docket # 19) for August 30, 2004, at 3:00 p.m. Counsel are to submit a Report of Parties Planning Meeting by August 26, 2004.

8. The fourth and fifth balancing factors identified by *Elec. For Imaging,* 340 F.3d at 1352, do not apply here, as this case involves the application of uniform federal patent law, not state law.